HERBERT GERSHKOWITZ, ET AL.,[1] PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4413-82, 23158-82,     Filed April 21, 1987.
23159-82, 23160-82,
23192-82, 23238-82,
23241-82, 23242-82,
23245-82.

*Steven Kamerman*, for the petitioners.
*Lawrence Ziegler* and *David Goldberg*, for the respondent.

WRIGHT, *Judge*: Respondent determined deficiencies in
petitioners' 1977 Federal income taxes as follows:

[1]Cases of the following petitioners are consolidated herewith: Anthony D. Famighetti and
Estate of Helen M. Famighetti, Deceased, Anthony D. Famighetti and The First National
Bank of Long Island, Executors, docket No. 23158-82; Martin Greenberg and Thelma
Greenberg, docket No. 23159-82; Charles Druck and Roslyn Druck, docket No. 23160-82;
Wallace Kandell and Phyllis Kandell, docket No. 23192-82; Ernest Malbin and Dorothy
Malbin, docket No. 23238-82; Raymond Tracht and Josephine Tracht, docket No. 23241-82;
Arthur A. Friedberg and Esther H. Friedberg, docket No. 23242-82; James V. Dowler, Jr., and
Patricia Dowler, docket No. 23245-82.

| Petitioner | Deficiency |
|---|---|
| Herbert Gershkowitz | $8,888 |
| Anthony D. Famighetti and Estate of Helen M. Famighetti, deceased | 8,158 |
| Martin Greenberg and Thelma Greenberg | 1,669 |
| Charles Druck and Roslyn Druck | 8,978 |
| Wallace Kandell and Phyllis Kandell | 7,162 |
| Ernest Malbin and Dorothy Malbin | 15,649 |
| Raymond Tracht and Josephine Tracht | 16,637 |
| Arthur A. Friedberg and Esther H. Friedberg | 7,106 |
| James V. Dowler, Jr., and Patricia Dowler | 28,542 |

The issues for consideration are (1) whether the cancellation of certain nonrecourse debts of limited partnerships in which petitioners[2] were limited partners resulted in taxable income to the partners under section 61(a)(12),[3] and whether the cancellation of such debts results in a deemed distribution of money under section 752(b) to the partners which is taxable as a capital gain under section 731(a)(1) to the extent their share of such distribution exceeds their adjusted bases in their partnership interests; (2) whether the limited partnerships realized gain upon the reconveyance of certain computer programs and systems in exchange for the extinguishment of a nonrecourse debt owed by the partnership, and the character of such gain; (3) whether the partners realized a loss under section 1001 upon the exchange of certain stock for the extinguishment of nonrecourse debt owed by the partnership; and (4) whether the 1977 amendment to the partnership agreement had substantial economic effect within the meaning of section 704(b).

## FINDINGS OF FACT

The facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

At the time the petitions herein were filed, petitioner Herbert Gershkowitz (Gershkowitz) resided in Chappaqua, New York. Petitioner Anthony D. Famighetti, who is one of

---

[2] Only one petitioner in each docket was a limited partner. For convenience, we will sometimes refer to the limited partners as petitioners and in the masculine gender.

[3] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years here in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

the executors of the Estate of Helen M. Famighetti (Famighetti), resided in Glen Head, New York. The other executor of the Estate of Helen M. Famighetti was the National Bank of Long Island, the principal place of business of which was Glen Head, New York. Petitioners Martin Greenberg and Thelma Greenberg (Greenberg) resided in Merrick, New York. Petitioners Charles M. Druck and Roslyn Druck (Druck) resided in Rockville Centre, New York. Petitioners Wallace Kandell and Phyllis Kandell (Kandell) resided in Remsenberg, New York. Petitioners Ernest Malbin and Dorothy Malbin (Malbin) resided in Smithtown, New York. Petitioners Raymond Tracht and Josephine Tracht (Tracht) resided in East Williston, New York. Petitioners Arthur Friedberg and Esther Friedberg (Friedberg) resided in West Hempstead, New York. Petitioners James V. Dowler, Jr., and Patricia Dowler (Dowler) resided in Manhasset, New York. Each of the petitioners timely filed a Federal income tax return for 1977.

### The Digitax Partnerships

Digitax of New England, Digitax of Michigan, Digitax Southeast, and Digitax of Pennsylvania (hereinafter collectively referred to as the Digitax partnerships) were all limited partnerships organized in 1972 for the purpose of engaging in the business of the computerized preparation of tax returns. Tax Management Corp. (now known as and hereinafter referred to as Vanguard Ventures, Inc.) was the sole general partner of each of the Digitax partnerships. During the years 1972 through 1977, Carl G. Paffendorf was the principal owner of Vanguard Ventures, Inc. During 1976 and 1977, Mr. Paffendorf was the chairman of the board and secretary of Vanguard Ventures, Inc.

Each of the petitioners in the instant case was a limited partner during the year 1977 and had made total capital contributions through 1977 to the partnership(s) as follows:

| Petitioner | Limited partnership | Amount |
|---|---|---|
| Herbert Gershkowitz | Digitax Southeast | $10,000 |
| Helen Famighetti[1] | Digitax of New England | 10,000 |
| Greenberg and Kandell[2] | Digitax of Michigan | 10,000 |
| Charles Druck | Digitax of Michigan | 10,000 |
| Wallace Kandell, nominee[3] | Digitax of Michigan | 10,000 |

| Petitioner | Limited partnership | Amount |
|---|---|---|
| Ernest Malbin | Digitax Southeast | $10,000 |
| Ernest Malbin | Digitax of New England | 10,000 |
| Raymond Tracht | Digitax of New England | 10,000 |
| Raymond Tracht | Digitax of Michigan | 10,000 |
| Arthur Friedberg | Digitax of New England | 10,000 |
| James Dowler | Digitax of Pennsylvania | 50,000 |

[1] Helen Famighetti died on Nov. 14, 1977, and the executors of her estate are Anthony Famighetti and the First National Bank of Long Island.

[2] Petitioners Martin Greenberg and Wallace Kandell and a third party who is not a petitioner to this case were partners in the Greenberg and Kandell partnership which owned a limited partnership interest in Digitax of Michigan. Greenberg owned a 25-percent interest, representing a $2,500 capital contribution, and Kandell owned a 37.5-percent interest, representing a $3,750 capital contribution in the partnership.

[3] Petitioner Wallace Kandell owned 50 percent of the partnership interest listed in his name, representing a $5,000 capital contribution, as a nominee for a third party who is not a petitioner in this case.

For the years 1972 through 1977, each of the Digitax partnerships used the cash method of accounting to compute its taxable income.

Each of the Digitax partnerships was organized in New York and was to remain in existence through December 31, 1992, unless it was terminated prior to that date.

When the partnerships were formed, the general partner, Vanguard Ventures, Inc., contributed 38,000 shares of the common stock (1 cent par value) of COAP Systems, Inc. (hereinafter COAP), in exchange for a 19-percent interest in each partnership. The initial limited partner of each partnership contributed 2,000 shares of the common stock of COAP in exchange for a 1-percent interest in the partnership. Under the partnership agreement, all net income and losses of the partnership, including gains or losses realized on the sale, exchange or involuntary conversion of partnership property were to be allocated to the partners according to the ratios that their capital contributions bore to the total capital contributions of all the partners. However, until each limited partner had received distributions from the partnership which were equal to his initial capital contribution, all net income and net losses of the partnership were to be credited or charged, respectively, 95 percent to the accounts of the limited partners in the same proportion as their

capital contributions and 5 percent to the account of the general partner.

### Digitax Associates Transaction

On November 8, 1972, each of the Digitax partnerships purchased computerized income tax preparation systems and programs from Digitax Associates for a total purchase price of $200,000. Digitax Associates was a limited partnership which was wholly owned by Digitax, Inc., and COAP. Digitax, Inc., was a wholly owned subsidiary of COAP. Each partnership was restricted in the use of these programs to a specified geographical territory within the United States. For example, the specified geographical territory for Digitax of Michigan was the State of Michigan and the specified geographical territory for Digitax of Pennsylvania was the State of Pennsylvania.

Of the total purchase price of $200,000, $6,667 was paid in cash and the balance of $193,333 was payable by a nonrecourse note dated November 8, 1972. The nonrecourse note was payable in five annual installments, with payments of $40,000 due on April 30, 1973, 1974, 1975, and 1976, and a final payment of $33,333 due on April 30, 1977. Interest on the note was payable at the rate of 7½ percent per year on the outstanding amount. The note was secured only by the Digitax computer program, and under the terms of the note, in the event of default, Digitax Associates could proceed to sell the collateral and keep the proceeds thereof, but in no event could it proceed against each Digitax partnership, its general partner, its limited partners or their assets. Each Digitax partnership granted Digitax Associates a security interest in the purchased computerized programs.

Digitax Associates provided a warranty, under the terms of the contract of sale, that the program could be used to process Federal and State income tax returns and that the program would be free of design defects for a 5-year period. Digitax Associates agreed to maintain the program until December 31, 1977. The fees charged for such maintenance were $80,000 each year for 1972, 1973, and 1974, $40,000 for 1975, and $20,000 for 1976 and each year thereafter.

The sales agreement provided that if each Digitax partnership processed less than a stated number of returns for a given year, Digitax Associates would defer payment of any installment due until the earlier of the first tax year in which the minimum number of returns were processed or September 30, 1977. In order for each partnership to meet the quota of processed returns set forth in the agreement, Digitax Associates could assign to each partnership the preparation of tax returns in unassigned geographical territories controlled by Digitax Associates.

The sales quotas contained in the agreement were not met for the years 1973, 1974, 1975, and 1976. Digitax, Inc., then parent of Digitax Associates, therefore elected to allocate to each partnership the processing of returns from other geographic territories, thereby increasing each partnership's income. The total sales allocated to the partnerships were as follows:

| Year | Amount |
|------|--------|
| 1973 | $30,349 |
| 1974 | 151,311 |
| 1975 | 249,899 |
| 1976 | 346,237 |

COAP and its subsidiaries received revenue from the partnerships as follows:

| FYE Apr. 30— | Amount |
|--------------|--------|
| 1973 | $900,663 |
| 1974 | 859,088 |
| 1975 | 670,492 |
| 1976 | 615,745 |

On April 15, 1975, Digitax, Inc., advised the general partner of each partnership that it agreed to modify the payment terms of the sales agreement entered into between each partnership and Digitax Associates by reducing the purchase price installments due on April 30 of each year from $40,000 to $30,000, until the balance was paid, with the last payment to be $23,333.

*COAP Planning Transaction*

On April 15, 1973, each Digitax partnership purchased from COAP Computer Programming, Inc. (now known as and hereinafter referred to as COAP Planning, Inc.), three

computerized systems known as CS101, CS201 and CS301. These systems consisted of computer programs for estate planning, asset management and financial planning and related documentation and were acquired for a total purchase price of $100,000, restricted for use in serving customers with offices located in specified geographical territories in the United States. Of the total purchase price of $100,000, each partnership paid $20,000 cash and the balance of $80,000 was payable with a nonrecourse note. The principal amount of the nonrecourse note was payable in four equal annual installments of $20,000 due on April 15, 1974, 1975, 1976, and 1977. Interest on the principal amount of the note was payable at the rate of 7 percent per year on the outstanding amount. As security for the nonrecourse note, COAP Planning, Inc., retained a security interest in the computer programs and systems.

COAP Planning, Inc., agreed to provide any improvements or enhancements to the estate and financial planning programs to each Digitax partnership for a fee of $5,000 per year payable in advance of April 15 of each year for the period from April 15, 1973, through April 15, 1978. COAP Planning, Inc., also agreed to assist each partnership in the marketing of services within its specific territory for an additional fee of $5,000 per year.

Finally, under the purchase agreement, the Digitax partnerships were entitled to cancel the purchase agreement with COAP Planning, Inc., if their gross sales from the services connected with this purchase were less than $25,000 for the 12-month period ending April 30, 1974. If the partnerships elected to cancel the agreement, they would forfeit all prior payments made to COAP Planning, Inc.

For the fiscal period ending on April 30, 1974, each of the partnerships had less than $25,000 in gross sales but did not exercise their right to cancel the sales contract.

COAP Planning, Inc., gave a warranty to each partnership that the systems and programs would be free from design defects for a period of 5 years.

On April 15, 1975, COAP Planning, Inc., advised the general partners of each Digitax partnership that it agreed to defer the payment of interest as well as purchase price

installments of $20,000 each due on April 15, 1975, and April 15, 1976, until April 15, 1978, and April 15, 1979, respectively, and agreed to waive the $5,000 program enhancement fee due April 15, 1975.

The computer systems and programs purchased by each Digitax Partnership from Digitax Associates and COAP Planning, Inc., were used in the business of the Digitax partnerships.

### COAP Management Agreement

COAP Systems, Inc. (COAP), on November 8, 1972, agreed to perform on behalf of Vanguard Ventures, Inc., and each Digitax partnership, the management and administrative responsibilities of Vanguard Ventures, Inc., as set forth in a limited partnership agreement. The management agreement between COAP and the Digitax partnerships was amended as set forth in a letter dated December 17, 1973, whereby the obligation of COAP in respect of the management and administrative responsibilities of Vanguard Ventures, Inc., was terminated effective January 1, 1974. The initial term of the management agreement was 5 years, and COAP was to be compensated $10,000 per year by Vanguard Ventures, Inc., plus a sum equal to 2 percent of the gross sales of each Digitax partnership. In addition, COAP was to receive up to $25,000 from Vanguard Ventures, Inc., for its accountable expenses which were incurred in the operation of the business of the Digitax partnerships during the first year. Under the agreement, COAP, in its discretion, could place the employees of the partnerships on its own payroll and pay other normal, necessary, and reasonable expenses on behalf of the partnerships. The agreement also provided that if the number of tax returns processed by or on behalf of the Digitax partnerships was less than 1,000 in 1972, 5,000 in 1973, 8,000 in 1974, 12,000 in 1975, and/or 17,000 in 1976, COAP would defer its annual compensation until the tax year in which the minimum number of returns was processed or until September 30, 1977, whichever came first. Further, the management agreement provided that COAP was obligated to lend or arrange for a loan of up to $200,000 to each partnership, in increments of no less than $25,000, within 30 days of a written request from Vanguard

Ventures, Inc., if, in the opinion of Vanguard Ventures, Inc., such funds were necessary for the working capital of the partnership. Finally, the agreement provided that COAP would not compete with the Digitax partnerships within their specified geographical territories, but was free to enter into similar management agreements with other partnerships and persons in areas not included in such territories. The amendment to the management agreement between COAP and each Digitax Partnership with respect to COAP's management obligations did not affect those portions of the management agreement relating to COAP's obligation to procure loans for the partnerships or to COAP's covenant not to compete.

Each Digitax partnership entered into an agreement with COAP which granted COAP the option of purchasing, at a fixed price, the assets of each partnership at any time after December 31, 1978. The option agreement was dated November 8, 1972. COAP could not exercise the option as long as the partnership had any outstanding loans due to COAP or any affiliates of COAP.

*COAP Systems, Inc.*

From 1972 through 1977, COAP wholly owned several subsidiaries including Digitax, Inc., and COAP Planning, Inc. COAP, along with Digitax, Inc., also wholly owned the limited partnership Digitax Associates. Carl G. Paffendorf owned 16 percent of the common stock of COAP. Prentice-Hall, Inc., owned 15 percent of the common stock of COAP plus 49 percent of the preferred stock. Digitax, Inc., and Digitax Associates had a marketing agreement in 1972 whereby Digitax, Inc., was to do all the selling and marketing of the products of Digitax Associates. In 1975, Digitax Associates became wholly owned by Digitax, Inc., and was absorbed into it. During 1976, COAP Computer Programming Inc., changed its corporate name to COAP Planning, Inc. Paffendorf was the president and director of COAP during the years 1972 through 1977. In addition to the stock he held, other shares of COAP common stock were owned by members of his family and by Vanguard Ventures.

In 1972, Prentice-Hall, Inc., exchanged long-term debt owed to it by COAP for COAP common stock. In addition, Prentice-Hall, Inc., loaned $500,000 to COAP in that year and canceled a $70,000 note of COAP in exchange for a $570,000 note from COAP due on November 30, 1977, and a warrant to purchase 456,000 shares of COAP common stock. COAP agreed that for each $500,000 in cash received by COAP or Digitax Associates from the Digitax partnerships, it would prepay $100,000 of the $570,000 note on June 30, subsequent to such receipt. The note was due on November 30, 1977. Prentice-Hall, Inc., waived the $100,000 prepayment due on June 30, 1973.

The $570,000 note was secured by the computer programs used for the preparation of income tax returns and estate planning (CS101) which were prepared by Digitax Associates and COAP Planning, respectively. In addition to this security interest, COAP was restricted from entering into any contract or commitment in excess of $50,000 without Prentice-Hall's consent as long as $150,000 of the $570,000 note remained outstanding. In July of 1974, COAP paid $300,000 of the $570,000 note leaving a balance due of $270,000. In November 1974, Prentice-Hall loaned COAP an additional $300,000 at an interest rate equal to the prime rate. This loan was unsecured.

During 1973 and 1974, approximately 55 percent and 46 percent, respectively, of COAP's gross revenues were the result of sales to the Digitax partnerships.

In June of 1972, the Institute for Business Planning (IBP) a wholly owned subsidiary of Prentice-Hall, entered into an agreement with COAP to sell its Digitax income tax preparation service. This agreement was terminated on June 27, 1973, and a similar agreement was entered into between COAP and Prentice-Hall. During the fiscal year which ended July 31, 1975, Prentice-Hall received commissions from COAP of approximately $192,000 as a result of being the sales agent for the Digitax income tax preparation service. The agreement for Prentice-Hall to serve as the marketing and sales agent of the Digitax income tax preparation service was terminated by COAP in 1976.

Prentice-Hall gave its consent to COAP to permit Digitax Associates to sell the income tax preparation program to

the Digitax partnerships. The income tax preparation program that was sold to the Digitax partnerships was the same as the income tax preparation program which was used to secure the $570,000 note from COAP to Prentice-Hall. Prentice-Hall released its security interest in the computer program used for estate planning (CS101) to enable COAP to sell this program to the Digitax partnerships free of liens.

*Prentice-Hall Loans*

On November 8, 1972, Prentice-Hall, Inc., loaned $50,000 to each of the Digitax partnerships on a nonrecourse basis. Each loan was due on November 30, 1977, with interest payable annually at the rate of 7 percent. The loan was secured by 40,000 shares of the common stock of COAP Systems, Inc., which was owned by each Digitax partnership. Each partnership also provided Prentice-Hall with a security interest in the computer programs, systems, and documentations for the income tax preparation service prepared by Digitax Associates. However, this security interest was subordinate to the security interest of Digitax Associates. Prentice-Hall was also given the option to acquire the 40,000 COAP common shares from each Digitax partnership at a purchase price of $1.25 per share.

On June 30, 1973, Prentice-Hall loaned $100,000 to each of the Digitax partnerships on a nonrecourse basis. This loan was due on June 30, 1978. Interest on the June 30, 1973, loan was payable annually at the rate of 7 percent. This loan was secured by a security interest in the computer programs, systems, and documentations for the preparation of estate planning and financial analysis reports. However, this security interest was subordinate to that of COAP Planning.

On July 1, 1974, Prentice-Hall loaned another $100,000 to each of the Digitax partnerships on a nonrecourse basis. This loan was payable on June 30, 1979, and interest thereon was payable annually at the rate of 8 percent. This loan was to be secured by the accounts receivable of each Digitax partnership, beginning on May 1, 1979. On the same date, each partnership agreed to give Prentice-Hall, as additional security for the $50,000 loan of November 8,

1972, a security interest in the accounts receivable of each partnership, effective May 1, 1977. Further, each partnership agreed to give Prentice-Hall, as additional security for the loan of June 30, 1973, a security interest in the accounts receivable of each partnership, effective May 1, 1978. The $50,000 and $100,000 loans made by Prentice-Hall on November 8, 1972, and June 30, 1973, respectively, to each of the Digitax partnerships were guaranteed by COAP. On March 7, 1973, Prentice-Hall released COAP from its guarantee of the four $50,000 nonrecourse loans made by Prentice-Hall in 1972 to the four Digitax partnerships involved herein. On April 30, 1974, Prentice-Hall released COAP from its guarantees of the four $100,000 nonrecourse loans made in 1973 to the Digitax partnerships.

The stated consideration providing for the release of COAP from its guarantee of the $50,000 loans was COAP's agreement to waive the condition which required that a prepayment of $100,000 on COAP's $570,000 debt to Prentice-Hall had to be made only if COAP received the sum of $500,000 from the Digitax partnerships in any year. The stated consideration for the release of COAP from its guarantee of the $100,000 loans was COAP's promise to pay $500,000 to Prentice-Hall on or before May 1, 1975, and partial satisfaction of the $570,000 note which was due June 30, 1977.

## COAP Loans

On various dates in 1975 and 1976, COAP loaned funds to each Digitax Partnership on a nonrecourse basis. These loans were payable on demand and secured by the Digitax computer program, the COAP Planning computer program, the accounts receivable of the partnerships, and the 40,000 shares of common stock of COAP owned by each partnership. The security interests granted to COAP by each partnership were subordinate to the security interests of Digitax, Inc., COAP Planning, Inc., and Prentice-Hall, Inc. The nonrecourse loans made by COAP to each Digitax partnership were as follows:

(a) *Digitax of Pennsylvania*

| Date of loan | Amount |
|---|---|
| Dec. 16, 1976 | $112,000 |
| Dec. 29, 1976 | 20,000 |
| Nov. 28, 1975 | 18,620 |
| Dec. 26, 1975 | 16,000 |
| Total | 166,620 |

(b) *Digitax of New England*

| Date of loan | Amount |
|---|---|
| Nov. 28, 1975 | $42,400 |
| Dec. 29, 1975 | 18,500 |
| Oct. 30, 1975 | 11,957 |
| Oct. 26, 1976 | 95,000 |
| Dec. 29, 1976 | 20,000 |
| Total | 187,857 |

(c) *Digitax of Michigan*

| Date of loan | Amount |
|---|---|
| Nov. 28, 1975 | $42,217 |
| Dec. 23, 1975 | 18,000 |
| Dec. 16, 1976 | 115,500 |
| Dec. 29, 1976 | 20,000 |
| Total | 195,717 |

(d) *Digitax Southeast*

| Date of loan | Amount |
|---|---|
| Nov. 28, 1975 | $18,034 |
| Dec. 23, 1975 | 20,000 |
| Dec. 7, 1976 | 118,500 |
| Dec. 29, 1976 | 20,000 |
| Total | 176,534 |

## Vanguard Ventures Loans

Vanguard Ventures, Inc., loaned funds to each Digitax partnership on a nonrecourse basis at various times prior to January 1, 1977. These loans, repayable on demand, were as follows:

| Amount | Borrower |
|---|---|
| $8,500 | Digitax of Pennsylvania |
| 2,500 | Digitax of New England |
| 10,500 | Digitax of Michigan |
| 7,500 | Digitax Southeast |

## Liquidation

The assets and liabilities of each of the Digitax partnerships as reflected on their books and records as of January 1, 1977, are as follows:

**(a) *Digitax of Pennsylvania***

| Assets | | Amount |
|---|---|---|
| Cash | | $254 |
| Digitax computer program: | | |
| Cost | $200,000 | |
| Less depreciation | 166,667 | 33,333 |
| CS 101/201/301 computer program: | | |
| Cost | 100,000 | |
| Less depreciation | 75,000 | 25,000 |
| COAP Systems, Inc., stock | | |
| (40,000 common shares) | | 50,000 |
| Total assets | | 108,587 |

| Liabilities | | |
|---|---|---|
| Prentice-Hall, Inc., due 11/30/77 | | 50,000 |
| Prentice-Hall, Inc., due 6/30/78 | | 100,000 |
| Prentice-Hall, Inc., due 6/30/79 | | 100,000 |
| Digitax, Inc., due in installments of $30,000 and $23,333 on Apr. 30, 1977, and Apr. 30, 1978, respectively | | 53,333 |
| COAP Planning, Inc., due $20,000 per annum on 4/15/77 through 4/15/79 | | 60,000 |
| COAP Systems, Inc., due on demand, nonrecourse loans | | |
| *Date of loan* | | |
| Dec. 16, 1976 | 112,000 | |
| Dec. 29, 1976 | 20,000 | |
| Nov. 28, 1975 | 18,620 | |
| Dec. 26, 1975 | 16,000 | 166,620 |
| Digitax, Inc., due on demand, nonrecourse loan | | 2,750 |
| Vanguard Ventures, Inc., due on demand, nonrecourse loans | | 8,500 |
| Total liabilities | | 541,203 |

**(b) *Digitax of New England***

| Assets | | Amount |
|---|---|---|
| Cash | | $141 |
| Digitax computer program: | | |
| Cost | $200,000 | |
| Less depreciation | 166,667 | 33,333 |
| CS 101/201/301 computer program: | | |
| Cost | 100,000 | |
| Less depreciation | 75,000 | 25,000 |
| COAP Systems, Inc., stock | | |
| (40,000 common shares) | | 50,000 |
| Total assets | | 108,474 |

| Liabilities | | |
|---|---|---|
| Prentice-Hall, Inc., due 11/30/77 | | 50,000 |
| Prentice-Hall, Inc., due 6/30/78 | | 100,000 |
| Prentice-Hall, Inc., due 6/30/79 | | 100,000 |

Digitax, Inc., due in installments of
$30,000 and $23,333 on Apr. 30, 1977,
and April 30, 1978, respectively.................. $53,333
COAP Planning, Inc., due $20,000 per
annum on 4/15/77 through 4/15/79.............. 60,000
COAP Systems, Inc., due on demand,
nonrecourse loans

*Date of loan*

| | | |
|---|---|---|
| Nov. 28, 1975....................... | $42,400 | |
| Dec. 29, 1975 ....................... | 18,500 | |
| Oct. 30, 1975 ....................... | 11,957 | |
| Oct. 26, 1976 ....................... | 95,000 | |
| Dec. 29, 1976 ....................... | 20,000 | 187,857 |

Vanguard Ventures, Inc., due on demand,
nonrecourse loans ............................. 2,500
Total liabilities................................. 553,690

(c) *Digitax of Michigan*:

| Assets | | *Amount* |
|---|---|---|
| Cash............................................ | | $255 |
| Digitax computer program: | | |
| Cost............................... | $200,000 | |
| Less depreciation .................. | 166,667 | 33,333 |
| CS 101/201/301 computer program: | | |
| Cost............................... | 100,000 | |
| Less depreciation .................. | 75;000 | 25,000 |
| COAP Systems Inc.,stock | | |
| (40,000 common shares) ........................ | | 50,000 |
| Total assets .................................. | | 108,588 |

*Liabilities*

Prentice-Hall, Inc., due 11/30/77 .................... 50,000
Prentice-Hall, Inc., due 6/30/78 ..................... 100,000
Prentice-Hall, Inc., due 6/30/79 ..................... 100,000
Digitax, Inc., due in installments of
$30,000 and $23,333 on Apr. 30, 1977,
and Apr. 30, 1978, respectively ................. 53,333
COAP Planning, Inc., due $20,000 per
annum on 4/15/77 through 4/15/79.............. 60,000
COAP Systems, Inc., due on demand,
nonrecourse loans

*Date of loan*

| | | |
|---|---|---|
| Nov. 28, 1975....................... | 42,217 | |
| Dec. 23, 1975 ....................... | 18,000 | |
| Dec. 16, 1976 ....................... | 115,500 | |
| Dec. 29, 1976 ....................... | 20,000 | $195,717 |

Vanguard Ventures, Inc., due on demand,
nonrecourse loans ............................. 10,500
Total liabilities................................. 569,550

(d) *Digitax Southeast*:

| Assets | | Amount |
|---|---|---|
| Cash | | $430 |
| Digitax computer program | | |
| Cost | $200,000 | |
| Less depreciation | 166,667 | 33,333 |
| CS 101/201/301 computer program | | |
| Cost | 100,000 | |
| Less depreciation | 75,000 | 25,000 |
| COAP Systems, Inc., stock | | |
| (40,000 common shares) | | 50,000 |
| Total assets | | 108,763 |
| **Liabilities** | | |
| Prentice-Hall, Inc., due 11/30/77 | | 50,000 |
| Prentice-Hall, Inc., due 6/30/78 | | 100,000 |
| Prentice-Hall, Inc., due 6/30/79 | | 100,000 |
| Digitax, Inc., due in installments of | | |
| $30,000 and $23,333 on Apr. 30, 1977, | | |
| and Apr. 30, 1978, respectively | | 53,333 |
| COAP Planning, Inc., due $20,000 per | | |
| annum on 4/15/77 through 4/15/79 | | 60,000 |
| COAP Systems, Inc., due on demand, | | |
| nonrecourse loans | | |
| *Date of loan* | | |
| Dec. 23, 1975 | 20,000 | |
| Nov. 28, 1975 | 18,034 | |
| Dec. 7, 1976 | 18,500 | |
| Dec. 29, 1976 | 20,000 | 176,534 |
| Vanguard Ventures, Inc., due on demand, | | |
| nonrecourse loans | | 7,500 |
| Total liabilities | | 547,367 |

The fair market value of the Digitax computer programs and the COAP Planning computer programs owned by each partnership was $30,000 at all times throughout 1977. The fair market value of the 40,000 shares of restricted COAP common stock owned by each Digitax partnership was $2,500 at all times during 1977.

In a letter dated October 20, 1976, Prentice-Hall, Inc., COAP, and the Digitax partnerships agreed to terminate their relationship. The time period for the termination of this relationship was extended to June 20, 1977, by a letter dated December 22, 1976, from Prentice-Hall. On June 20, 1977, a cross-receipt and settlement agreement was entered into between Prentice-Hall and each of the Digitax partnerships whereby Prentice-Hall received $40,000 in cash and extinguished the $250,000 nonrecourse debt owed by each

partnership and released its security interest in the 40,000 shares of restricted COAP common stock as well as its security interest in the accounts receivable and computer programs. The $40,000 used by each of the partnerships to pay Prentice-Hall was loaned to the partnerships by COAP during 1977 on a nonrecourse basis.

The agreement provided that, upon receipt of $350,000 from COAP and $40,000 from each Digitax partnership, Prentice-Hall would:

(i) Contribute to COAP Systems Inc. ("COAP") the following COAP securities: 310,373 shares of COAP Common Stock, $.01 value; 75,000 shares of COAP Preferred Stock, $8.00 par value, and the Warrant to purchase 456,000 shares of COAP Common Stock;

(ii) Cancel the principal amount and all interest due and hereafter accruing on all indebtedness owed to P-H from COAP (and subsidiaries) including the following: $270,000 Promissory Note due June 30, 1977, $300,000 Promissory Note due May 31, 1977 and all other current indebtedness due May 31, 1977 aggregating $443,051 as of September 30, 1976;

(iii) Cancel the principal amount and all interest due and hereafter accruing on all indebtedness due P-H from the five Digitax Partnerships, including Promissory Notes in the total amount of $1,250,000 due in installments commencing November, 1977;

(iv) Release and cancel all security agreements and option rights relating to the foregoing and any and all other agreements relating to COAP (or subsidiaries), and the five Digitax Partnerships and P-H's option rights relating to an aggregate of 250,000 shares of COAP Common Stock owned by Mr. Carl G. Paffendorf.

On August 29, 1977, COAP, COAP Planning, Inc., and Digitax, Inc., entered into an agreement with each Digitax partnership. Under this agreement, each Digitax partnership conveyed and transferred to COAP Planning, Inc., and Digitax, Inc., all of the computer programs, systems, and technology which such partnership had originally purchased from COAP Planning, Inc., and Digitax, Inc.; and COAP, COAP Planning, Inc., and Digitax, Inc., extinguished all debts due to them from each Digitax partnership and terminated the security interests which collateralized such indebtedness. Also under this agreement, each Digitax partnership acknowledged receipt of the $40,000 nonrecourse loan received from COAP and used to pay Prentice-Hall. Such loan was secured by a security interest in the computer income tax programs and estate planning

programs and related assets owned by the partnership subject to prior security interests of record by the partnerships' accounts receivable, and by the 40,000 shares of COAP systems common stock owned by each partnership. As of the date the agreement was entered into, the total adjusted bases of the programs relating to the computerized preparation of Federal and State tax returns and estate and financial planning that were owned by each partnership was $58,333. The amount of the Digitax partnership debt that was extinguished by the August 29, 1977, agreement was as follows:[4]

| Partnership | Amount |
|---|---|
| Digitax of Pennsylvania | $322,703 |
| Digitax of Michigan | 349,050 |
| Digitax of New England | 341,190 |
| Digitax Southeast | 329,867 |

Also on August 29, 1977, Vanguard Ventures and each Digitax partnership entered into an agreement whereby each partnership returned to Vanguard Ventures the 40,000 shares of COAP common stock which had a basis of $50,000 to each partnership. At that time, the stock was not subject to any liabilities. Vanguard Ventures did not assume any liabilities of the Digitax partnerships in connection with the receipt of such stock. In exchange for this stock, Vanguard Ventures extinguished the nonrecourse debt of each Digitax partnership as follows:

| Partnership | Amount |
|---|---|
| Digitax of Pennsylvania | $11,223 |
| Digitax of Michigan | 13,223 |
| Digitax of New England | 4,025 |
| Digitax Southeast | 7,500 |

The agreement also provided for the termination of any and all security interests collateralizing such debt. Each of the limited partners of the Digitax partnerships executed a consent and general release which, among other things, released COAP and its subsidiaries Digitax, Inc., and COAP Planning, Inc., Prentice-Hall, and Vanguard Ventures and their respective officers and directors from any and all

---

[4]The amounts here indicated are the sum of the debts of each partnership's debts to COAP, Digitax, Inc., and COAP Planning, as indicated on the balance sheets, *supra,* and the $40,000 nonrecourse loan used to pay Prentice-Hall.

claims or causes of action or obligations which the limited partner may have had relating to the partnership or his investment therein.

On December 26, 1977, an amendment to the limited partnership agreement for each of the Digitax partnerships was executed. The amendment provided as follows:

WHEREAS, the parties hereto entered into a Limited Partnership Agreement dated as of the 8th day of November, 1972; and

WHEREAS, the parties have authorized the liquidation of said Partnership and the filing of a Certificate of Cancellation of the Certificate of Limited Partnership; and

WHEREAS, the parties hereto wish to authorize, ratify, approve and confirm the allocation of net profits and losses from capital transactions and related matters;

NOW, THEREFORE, the parties hereto agree

1. ARTICLE XIV (D) (4) is hereby amended in its entirety to be and read as follows: "The net profits and losses from capital transactions shall first be allocated among the partners pro-rata to eliminate any deficits in their respective capital accounts; thereafter net profits and losses from capital transactions shall be allocated in accordance with the profit and loss sharing ratio set forth in ARTICLE VI without regard to the last sentence thereof."

2. This Amendment shall be effective for all transactions occurring within the fiscal year of the partnership commencing January 1, 1977 through the effective date of the filing of the Certificate of Cancellation of the Certificate of Limited Partnership referred to above.

Article VI of the limited partnership agreement of each Digitax partnership read as follows:

All net income, and all net losses of the Partnership, computed in accordance with generally accepted accounting principles consistently applied, including gains or losses realized upon the sale, exchange or involuntary conversion of Partnership property, shall be allocated to the respective accounts of all partners, in the ratios that their capital contributions bear to the total capital contributions of all partners; provided, however, that until each limited partner shall have received distributions from the Partnership equal to his initial capital contribution, all net income and all net losses of the Partnership shall be credited or charged, as the case may be, as follows: 95 percent to the accounts of the limited partners in the same proportion as their capital contributions; and 5 percent to the account of the general partner. Any distribution of assets under Article XIV, paragraph (D) shall be made without reference to the above 95 percent - 5 percent proviso.

The intention of each partnership in making the 1977 amendment to the limited partnership agreement was (1) to

increase to zero the capital account of any partner who had a negative capital account by allocating to such partner the profits from any capital transaction resulting in gain during 1977; (2) to reduce to zero the capital accounts of all partners who have positive capital accounts by allocating to such partners the losses from any capital transaction resulting in a loss during 1977; (3) after all the capital accounts of the partners were increased or reduced, as the case may be, to zero, all additional profits and losses from capital transactions were to be allocated in accordance with the regular profit/loss sharing ratio of the partners as previously in effect; and (4) the ordinary loss of the partnership for calendar year 1977 was to be allocated in accordance with the regular profit/loss sharing ratio of the partners as previously in effect without regard to the allocation of profits and losses from capital transactions.

On December 28, 1977, each of the Digitax partnerships executed a certificate of cancellation of the certificate of limited partnership, and the partnerships were terminated. Each of the Digitax partnerships conducted no business during the year 1977 except as required to terminate its operations and liquidate the partnership. Prior to January 1, 1977, none of the Digitax partnerships had earned a profit in any taxable year. On January 1, 1977, and at all times thereafter, each Digitax partnership was insolvent. Each of the petitioners herein was solvent during the entire calendar year 1977.

The partnerships paid or incurred the following ordinary and necessary business expenses in 1977:

| Partnership | Amount |
| --- | --- |
| Digitax of Pennsylvania | $2,882 |
| Digitax of Michigan | 2,884 |
| Digitax of New England | 1,584 |
| Digitax Southeast | 284 |

As of January 1, 1977, and prior to the liquidation of each partnership, the adjusted basis, capital account and percent of each partners' interest in the Digitax partnerships is as follows:

| Petitioner | Digitax partnership | Capital account[1] | Adjusted basis | Percent interest in partnership |
|---|---|---|---|---|
| H. Gershkowitz | Digitax Southeast | ($19,155) | $1,437 | 3.762% |
| H. Famighetti | Digitax of New England | (19,740) | 1,090 | 3.762 |
| M. Greenberg[2] | Digitax of Michigan | (5,119) | 238 | 0.940 |
| C. Druck | Digitax of Michigan | (20,474) | 952 | 3.762 |
| W. Kandell[3] | Digitax of Michigan | (17,915) | 833 | 3.292 |
| E. Malbin | Digitax Southeast | (19,154) | 1,438 | 3.762 |
| E. Malbin | Digitax of New England | (19,739) | 1,091 | 3.762 |
| R. Tracht | Digitax of Michigan | (20,474) | 952 | 3.762 |
| R. Tracht | Digitax of New England | (19,739) | 1,091 | 3.762 |
| A. Friedberg | Digitax of New England | (14,951) | 5,879 | 3.762 |
| J. Dowler | Digitax of Pennsylvania | (78,780) | 22,503 | 18.810 |

[1]The capital accounts are all deficits.

[2]Greenberg owned a 25-percent interest in the Kandell and Greenberg partnership which in turn owned a 3.762-percent interest in Digitax of Michigan.

[3]Kandell owned a 37.5-percent interest in the Kandell and Greenberg partnership which in turn owned a 3.762-percent interest in Digitax of Michigan. Kandell also owned a 50-percent interest in Digitax of Michigan. His total interest therefore was 3.292 percent.

The transactions entered into between each of the Digitax partnerships and Prentice-Hall, Inc., COAP and its subsidiaries, Digitax Associates and Vanguard Ventures, Inc., are the same except for the outstanding amounts which were owed by each partnership to COAP, its subsidiaries, Digitax Associates, and Vanguard Ventures, Inc.

OPINION

1. *Prentice-Hall Transactions*

The first issue for consideration is whether petitioners must recognize a gain on the Prentice-Hall transaction. Each partnership received loans in the aggregate amount of $250,000 from Prentice-Hall. These loans were nonrecourse, and were secured by the 40,000 shares of COAP common stock owned by each partnership and by the accounts receivable of each partnership. Prentice-Hall also had a subordinate security interest in the computer programs purchased by each partnership from Digitax Associates and COAP Planning, Inc. On June 20, 1977, Prentice-Hall released its security interest in the COAP stock, the computer

programs, and the accounts receivable of the Digitax partnerships and extinguished the $250,000 debt owed by each partnership. In exchange, each partnership paid Prentice-Hall $40,000 in cash. The fair market value of the COAP stock at that time was $2,500. The partnerships were insolvent both before and after the transaction.

In determining whether petitioners in the instant case must recognize a gain on the discharge of the Prentice-Hall indebtedness, two sets of rules must be considered. First, the general provisions of section 61(a)(12) dealing with income from discharge of indebtedness, and secondly the distribution provision of section 752(b) relating to a decrease in partnership liabilities.

In general, gross income includes income from the discharge of indebtedness. Sec. 61(a)(12); *United States v. Kirby Lumber Co.*, 284 U.S. 1 (1931). Income realized by a partnership on the discharge of indebtedness is passed through to each partner under section 702, and the partner's basis in his partnership interest is increased by his distributive share of such income. Sec. 705(a)(1). Under a judicially created exception to this rule, however, a debtor will not recognize income under section 61(a)(12) if he is insolvent following the discharge of indebtedness. *Dallas Transfer & Terminal Warehouse Co. v. Commissioner*, 70 F.2d 95 (5th Cir. 1934); *Astoria Marine Construction Co. v. Commissioner*, 12 T.C. 798 (1949).

Under section 752(a), at the time a partnership assumes a liability, an individual partner's share of such liability is treated as a contribution of money by the partner to the partnership and increases the partner's basis in his partnership interest. Sec. 722. Conversely, any decrease in the partner's share of the partnership liabilities is treated as a distribution of money by the partnership to the partner under section 752(b) and results in the recognition of gain by the partner to the extent that such a distribution exceeds his adjusted basis in his partnership interest. Sec. 731(a)(1). The gain recognized is characterized as gain from the sale or exchange by the partner of his partnership interest, and is taken into income under section 61(a)(3) (gains derived from dealings in property).

Under section 61(a)(12), the Digitax partnerships realized income from the discharge of indebtedness when Prentice-Hall discharged the loans. This income was then passed through to the individual partners pursuant to section 702(a)(8). Petitioners argue that although income was realized, it should not be recognized in the instant case due to the insolvency exception to the discharge of indebtedness doctrine. In support of their position, petitioners cite *Stackhouse v. United States*, 441 F.2d 465 (5th Cir. 1971). *Stackhouse* involved an insolvent partnership which settled a debt of $126,882.86 with a payment of $30,000. The Commissioner determined that the individual partners had income from the discharge of indebtedness to the extent of their solvency following the transaction. The District Court found that the partners had ordinary income under section 61(a)(12) to the extent of their solvency. *Stackhouse v. United States*, an unreported case (W.D. Tex. 1970, 27 AFTR 2d 71-414, 71-1 USTC par. 9128). The taxpayers appealed, alleging that the transaction was governed by the partnership distribution provisions of sections 731 and 733. The Fifth Circuit Court of Appeals in *Stackhouse* attempted to reconcile the rules requiring recognition of discharge of indebtedness income with the partnership provisions providing for the treatment to partners on the discharge of a partnership liability. The court found that the discharge of partnership indebtedness resulted in a distribution to the partners under section 752(b) which resulted in a recognition of gain by each partner under section 731(a) to the extent that the amount distributed exceeded each partner's adjusted basis in his partnership interest. The court stated that "Section 731(a) merely prescribes the rules for determining the amount of income derived from this discharge of indebtedness to be included in the taxpayers' gross income under section 61(a)(12). In a sense then we are giving effect to both sections of the Code." 441 F.2d at 470; Fn. ref. omitted.

Petitioners maintain that the opinion in *Stackhouse* stands for the proposition that income from the discharge of indebtedness should be recognized at the partnership, rather than the partner, level, and that the insolvency exception to the discharge of indebtedness doctrine applies,

therefore, to the partnership. The solvency of the individual partners is immaterial under petitioners' analysis. Petitioners fail to note, however, that the court in *Stackhouse* was not faced with the issue of whether income should be recognized at the partner or the partnership level, but rather whether such income should be treated as ordinary income under section 61(a)(12) or capital gain under section 731(a). The court noted that "The United States concedes * * * that because the partnership had been insolvent before the settlement (its liabilities exceeded its assets), the gain to each partner should be recognized only to the extent of his solvency immediately after the settlement." 441 F.2d at 468. Thus, the parties in *Stackhouse* did not dispute, and the court did not consider, the level at which the insolvency exception applied, but rather the character of the partners' income.

Petitioners allege that their interpretation of *Stackhouse* is supported by the legislative history of the Bankruptcy Tax Act of 1980 (Pub. L. 96-589, December 24, 1980) (the act). Section 2(a) of the act amended section 108 of the Code to provide that the application of the code section providing for nonrecognition of discharge of indebtedness income when the taxpayer is insolvent should take place at the partner, rather than the partnership, level. Specifically, the legislative history states:

The bill provides that the rules of exclusion from gross income and reduction of tax attributes in section 108 of the Code (as amended by the bill) are to be applied at the partner level and not at the partnership level.[26]

[26]The effect of these provisions of the bill is to overturn the decision in *Stackhouse v. U.S.*, 441 F.2d 465 (5th Cir. 1971).

[S. Rept. 96-1035, at 21 (1980).]

Based on this footnote, petitioners argue that Congress perceived that, prior to the act, the insolvency exception to the recognition of discharge of indebtedness income was to be applied at the partnership level. Other than *Stackhouse*, however, petitioners cite no authority in support of this proposition, nor have we found any. As stated above, this issue was not addressed in *Stackhouse*. Further, by requiring recognition at the partner level, Congress provided for the inclusion of discharge of indebtedness income as a

separately stated income item under section 702(a)(7) which would trigger an increase in each partner's basis under section 705. The court in *Stackhouse*, which treated such income as a distribution under section 731, ignored these provisions. Thus, Congress' intent to overturn *Stackhouse* related to application of sections 702 and 705 to discharge of indebtedness income, rather than to the level at which such income is recognized. The legislative history indicates that the purpose of the amendment to section 108 was to clarify the requirement that discharge of indebtedness income was considered income to the individual partners under section 702 rather than solely as a partnership distribution under section 731. To the extent that the result of such treatment results in ordinary income, rather than capital gain as the court held in *Stackhouse*, Congress chose to overrule that case.

Even if we were to assume, however, that petitioners' analysis of the legislative history of the act was correct, we would still decline to follow the opinion of the Fifth Circuit in *Stackhouse*.[5] While the analysis used by the Fifth Circuit is appealing in that it purports to integrate the two sets of rules dealing with the discharge of indebtedness, the court failed to recognize that income recognized by a partner pursuant to section 731(a) is included in that partner's gross income under section 61(a)(3) rather than under section 61(a)(12). Income realized by a partnership under section 61(a)(12) must be recognized by the partners as ordinary income under section 702. The recognition of such income provides each partner with an increase in the adjusted basis of his partnership interest under section 705. The distribution provision of section 752(b) serves to offset the basis increase received by each partner when the indebtedness was incurred and does not provide for the distribution of section 61(a)(12) income. Distributions under section 752(b) result in capital gain under section 731(a). The two sets of rules operate independently and simultaneously. The Fifth Circuit, in *Stackhouse*, failed to consider the ordinary

---

[5]We note that appeal in the instant case, if taken, will lie in the Second Circuit. Therefore, we are not bound by the Fifth Circuit's opinion in *Stackhouse v. Commissioner*, 441 F.2d 465 (5th Cir. 1971). *Golsen v. Commissioner*, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Further, the decision in *Stackhouse* has been nullified by the enactment of the Bankruptcy Tax Act of 1980. S. Rept. 96-1035, at 21 (1980), 1980-2 C.B. 631.

income character of the income from the discharge of indebtedness under section 61(a)(12) as opposed to the capital gain recognized under section 731(a).

For the above-stated reasons, petitioners' reliance on *Stackhouse* is misplaced. The application of the insolvency exception to the discharge of indebtedness income should be made at the partner, not the partnership, level. Because each petitioner herein was solvent at the time the debts were discharged, each must recognize ordinary income with respect to his share of the partnership's income under section 702(a)(8). This income will provide each partner with an increase in basis under section 705(a)(1)(A). At the same time, each partner will receive a distribution from the partnership in an amount equal to his share of the partnership indebtedness. Sec. 752(b). This distribution will offset each partner's basis under section 733(1). Thus, the increase in basis under section 705, coupled with the distribution and decrease in basis under sections 752 and 733 result in a net change of zero in each partner's basis. The optional adjustments to basis enacted by the Bankruptcy Tax Act of 1980 were intended to change this result. S. Rept. 96-1035, at 21 (1980).

Respondent argues, on brief, that the partners should not be entitled to a basis increase under section 705(a)(1)(A) because of the realization of discharge of indebtedness income. Respondent asserts that the basis increase would provide an opportunity for limited partners to bail out of crossover tax shelter partnerships without the recognition of the "phantom gain" inherent in their partnership interests, citing W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 9.06[3] n. 144 (1977). We agree with respondent that, if the insolvency exception were to apply at the partnership level, such a step-up in basis would be abusive. In the instant case, however, we have determined that this exception must be applied at the partner level. When the loan proceeds were received by the partnerships, each partner increased his basis in his partnership interest by his distributive share of the liability. Sec. 722. This basis increase allowed the partners to deduct their distributive shares of partnership losses and deductions prior to the discharge of the loans. If

the partnerships had received ordinary income instead of loan proceeds in the years 1972-74, the partners would have recognized their distributive shares of such income during those years and consequently would have increased their bases in their partnership interests. Secs. 702(a)(8), 705(a)(1)(A). Because we are requiring the partners to recognize the same amounts as income in 1977, they should receive a basis increase in that year. While the partners were able to take advantage of the original basis increase on receipt of the loan proceeds in order to offset deductions during the intervening years, the mechanism for recognition of the use of such basis is contained in sections 752(b), 731(a), and 733, not in section 705. We note that because we have decided that the insolvency exception applies at the partner, not the partnership, level, we need not address respondent's contention that discharge of indebtedness income which is not recognized because the recipient of such income is insolvent does not constitute "tax-exempt receipts" for purposes of section 705(a)(1)(B).

Having concluded that each partner must recognize ordinary income from the discharge of indebtedness as a result of the Prentice-Hall transaction, we must now consider the amount of that income. Petitioners allege that each partnership realized income of $210,000 (liability of $250,000 less payment of $40,000), but that none of this amount must be recognized. Respondent, on the other hand, argues that each partnership has income of $2,500 under the doctrine developed by *United States v. Kirby Lumber Co.*, 284 U.S. 1 (1931).[6]

Although the statutory notices of deficiency issued in the instant case determined that each partner recognized income in 1977 to the extent of his distributive share of the amount of indebtedness that was discharged, less the amount of money paid to Prentice-Hall by each partnership,

---

[6]The notices of deficiency issued to petitioners in the instant case determined deficiencies in the amount of each petitioner's distributive share of the full amount of the debts discharged, less the amount of money transferred. Petitioners bear the burden of proving that these deficiencies are in error. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111 (1933). Respondent's argument that the *Kirby Lumber* rule applies to limit the amount of income to be recognized in the instant case was first raised on brief. Therefore, this argument does not constitute a new matter under Rule 142(a). *La Fargue v. Commissioner*, 73 T.C. 40, 52 n. 9 (1979); affd. in part, revd. in part 689 F.2d 845 (9th Cir. 1982); *Estate of Jayne v. Commissioner*, 61 T.C. 744, 748-49 (1974); *McSpadden v. Commissioner*, 50 T.C. 478, 492-93 (1968). Petitioners, therefore, still bear the burden of proof.

respondent argues on brief that the amount each partner must recognize is limited to the fair market value of the collateral for the loan. Thus, respondent maintains that each partner must recognize income on the amount of his distributive share of $2,500, which was the fair market value of the stock which secured the Prentice-Hall loans on the date that they were discharged. Respondent bases this analysis on *United States v. Kirby Lumber Co.*, *supra.* Although the Supreme Court did not explicitly state the rationale for the decision in that case, the courts have routinely cited *Kirby Lumber* for the proposition that a debtor must recognize income from the discharge of indebtedness because the assets which provided security for the loan are now available for other uses. Thus, the freeing of assets previously offset by a liability causes an increase in the taxpayer's net worth. This increase in the taxpayer's net worth has been described as an accession to income which must be recognized. See *Estate of Delman v. Commissioner*, 73 T.C. 15, 32 (1979); *Fulton Gold Corp. v. Commissioner*, 31 B.T.A. 519 (1934).

Respondent acknowledges that the rationale of the *Kirby Lumber* doctrine has been somewhat eroded by the Supreme Court's opinion in *Commissioner v. Tufts*, 461 U.S. 300 (1983). In *Tufts*, the Court was not called upon to determine the parameters of the discharge of indebtedness doctrine because the discharge of the loans at issue therein occurred when the property which was security for those loans was sold. The Court noted, however, that:

We are not presented with and do not decide the contours of the cancellation-of-indebtedness doctrine. We note only that our approach does not fall within certain prior interpretations of that doctrine. In one view, the doctrine rests on the same initial premise as our analysis here— an obligation to repay—but the doctrine relies on a freeing-of-assets theory to attribute ordinary income to the debtor upon cancellation. See *Commissioner v. Jacobson*, 336 U.S. 28, 38-40 (1949); *United States v. Kirby Lumber Co.*, 284 U.S. 1, 3 (1931). According to that view, when nonrecourse debt is forgiven, the debtor's basis in the securing property is reduced by the amount of debt canceled, and realization of income is deferred until the sale of the property. See *Fulton Gold Corp. v. Commissioner*, 31 B.T.A. 519, 520 (1934). Because that interpretation attributes income only when assets are freed, however, an insolvent debtor realizes income just to the extent his assets exceed his liabilities after the cancellation. *Lakeland Grocery Co. v. Commissioner*, 36 B.T.A.

289, 292 (1937). Similarly, if the nonrecourse indebtedness exceeds the value of the securing property, the taxpayer never realizes the full amount of the obligation canceled because the tax law has not recognized negative basis. [461 U.S. 300, 311 n. 11.]

The Court held that the amount realized on the sale of property included the full amount of nonrecourse debt to which the property was subject even when the value of the property was less than the outstanding amount of the obligation. Similar results had been reached by this Court in *Millar v. Commissioner*, 67 T.C. 656 (1977), affd. in part 577 F.2d 212 (3d Cir. 1978), and *Estate of Delman v. Commissioner*, *supra*. In *Millar*, we held that amounts which had been loaned to the taxpayers and which were secured by their stock in a subchapter S corporation were includable in the amount realized when the stock was surrendered in payment of the loans. The taxpayers in that case were able to treat the loan proceeds as contributions to capital in the subchapter S corporation, thereby providing them with increased basis and enabling them to deduct the corporation's losses. The Third Circuit Court of Appeals affirmed this Court's decision in *Millar*, stating:

This finding is totally in keeping with the spirit and reasoning of *Crane*. While not personally liable upon the loan from Jamison, the taxpayers utilized those funds to increase the basis of their stock, which then permitted them to claim sizable deductions calculated against that basis. See 26 U.S.C. secs. 163, 1374(a), (b). Having substantially reduced the adjusted basis of their stock in this manner and thereafter surrendering their devalued stock in exchange for the cancellation of their indebtedness, the taxpayers clearly realized taxable gain equal to the value of the cancelled obligation, less the adjusted basis of their surrendered stock. A finding that the taxpayers did not realize gain as a result of this exchange, after having realized the full economic benefit of this transaction, would entitle them to the type of double deductions of which the Supreme Court so clearly disapproved in *Crane*. [*Millar v. Commissioner*, 577 F.2d 212, 215 (3d Cir. 1978).]

If, as respondent urges, we restrict the amount realized by petitioners in the instant case to the fair market value of their stock at the time the indebtedness was canceled, petitioners in this case will achieve the result that the appellate court sought to avoid in *Millar*. Petitioners will have received the benefit of increased basis, which permitted them to take deductions based on the partnership's

losses, and will never have to recognize income on the receipt of $250,000 in cash. The amount paid by each partnership to Prentice-Hall in exchange for the release from the notes due was 80 percent of the amount of each partnership's basis in the stock which provided security for the notes. Had petitioners merely surrendered their stock to Prentice-Hall, they would have recognized ordinary income in the amount of $200,000 ($250,000 liability less $50,000). Petitioners attempted to avoid this result, 6 months after *Millar* was decided, by using cash rather than allowing Prentice-Hall to take the security for the notes. We cannot permit petitioners to avoid recognition of gain in this case by the simple expedient of transferring cash in the amount of 80 percent of their basis in the collateral, rather than transferring the collateral itself. To do so would exalt form over substance.

The general partner of the limited partnerships involved herein was Vanguard Ventures, Inc. At the time the partnerships were formed, Carl Paffendorf was the sole shareholder of Vanguard Ventures, Inc., and as such has been involved in several tax shelter promotions. See *Hagler v. Commissioner*, 86 T.C. 598 (1986); *Hoerrner v. Commissioner*, T.C. Memo. 1985-347. In *Hagler*, the Court considered the application of the at-risk rules of section 704(d) to certain limited partnerships formed by Mr. Paffendorf in 1977, subsequent to the liquidation of the limited partnerships involved in this case. These partnerships were formed for the same purpose as the Digitax partnerships: to market computer programs for the preparation of tax returns. Thus, the sole shareholder of the general partner in the instant case was able to market limited partnership interests in the Digitax partnerships, which provided substantial tax benefits to the limited partners, and use the assets of these partnerships to create new tax shelters once the partnerships were insolvent. By allowing the partners to avoid recognition of gain in this situation, we would be permitting the promoter to manipulate the tax laws in order to achieve the greatest possible tax loss with no economic loss. However, our analysis of the existing tax law, as discussed above, does not compel us to approve such manipulation, and we refuse to do so.

We also note that the interrelationship of the general partner, Vanguard Ventures, Inc., and COAP Systems, Inc., its subsidiaries, and Prentice-Hall offers considerable latitude for the manipulation of the transactions involved in the liquidation of the partnerships in the instant case. If we were to sanction such manipulation, the potential for tax abuse by tax shelter limited partnerships would be enormous. Generally, a debtor defaulting on a nonrecourse loan would merely surrender the collateral to the creditor in exchange for cancellation of the debt. Here, however, the partnerships' creditor discharged the loans in exchange for a payment equal to 80 percent of each partnership's basis in its stock. Prentice-Hall's agreement with the partnerships was part of a larger transaction involving the discharge of loans made to COAP by Prentice-Hall, the transfer to COAP of its stock previously held by Prentice-Hall, and the release of all security interests held by Prentice-Hall in the assets of COAP and the Digitax partnerships. In light of these facts, we are reluctant to permit petitioners to take advantage of the *Kirby Lumber* doctrine to avoid recognition of income when they, through the limited partnerships, received cash which enabled them to make full use of available tax benefits, yet were never required to reimburse the lender of that cash.

Petitioners attempted to avoid the *Millar* result by using cash to close the Prentice-Hall transaction. We cannot allow petitioners to accomplish indirectly what they were unable to do directly: that is, to avoid the recognition of gain on the discharge of the loan. We therefore hold that although petitioners transferred cash, rather than the stock which secured the loan, to Prentice-Hall in exchange for the discharge of the partnerships' debts, they must recognize gain to the extent that the amount of debt discharged exceeded the cash transferred. Further, the restrictions of the *Kirby Lumber* doctrine are not applicable in the instant case to permit the partnerships to avoid recognition of the full amount of indebtedness which was discharged. Accordingly, each partner must recognize gain under section 702 to the extent of his distributive share of $210,000.

## 2. *COAP, COAP Planning, Inc., and Digitax, Inc., Transactions*

The next issue for consideration is the amount and character of the gain which petitioners must recognize on the discharge of the loans from COAP, COAP Planning, Inc., and Digitax, Inc. Each partnership entered into an agreement with COAP, COAP Planning, Inc., and Digitax, Inc., on August 29, 1977, under which the partnership debts to each entity were discharged. In exchange, each partnership transferred to COAP Planning, Inc., and Digitax, Inc., all computer programs, systems, and technology which were originally purchases by the partnerships from COAP Planning, Inc., and Digitax, Inc. Respondent urges that the discharge of indebtedness under the agreement be treated as a single transaction. Petitioners argue, however, that there are three separate transactions involved and that each must be separately addressed. We agree with petitioners.

By arguing that the agreement results in one transaction between the partnerships and COAP, COAP Planning, Inc., and Digitax, Inc., respondent is seeking sale or exchange treatment for the entire amount of indebtedness discharged under the agreement. Such an analysis enables respondent to adopt the position that petitioners must recognize the full amount realized, less their basis in the property reconveyed to COAP Planning, Inc., and Digitax, Inc., without confronting the *Kirby Lumber* problem discussed above with respect to the loans from COAP Systems, Inc. Because of our holding with respect to the Prentice-Hall transaction, however, we do not need to adopt respondent's analysis in order to require the recognition of income by petitioners on the discharge of the COAP Systems, Inc., loans.

Further, although we recognize that there is a close relationship between all parties to the transactions in the instant case, we cannot ignore the independent corporate identities of COAP Planning, Inc., and Digitax, Inc. The corporate entity may be disregarded only when the court finds that it is a sham or unreal. *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 438-439 (1943). Therefore, we will treat the discharge of the partnerships' debt with each corporation as a separate transaction.

Under our holding with respect to the Prentice-Hall transaction, above, the discharge of the debt owed by the partnerships to COAP must be passed through to each partner under section 702(a)(8) and will provide a commensurate increase in basis under section 705(a)(1)(A). At the same time, each partner will receive a distribution under section 752(b) which will reduce his basis under section 733(1).

The discharge of partnership debt by COAP Planning, Inc., and Digitax, Inc., is treated as a sale or exchange because the partnerships surrendered the security for the indebtedness to their creditors. *Estate of Delman v. Commissioner, supra.* These transactions are, therefore, governed by the rules of section 1001 and not by the discharge of indebtedness doctrine. Income realized as a result of these transactions is reported under section 61(a)(3) rather than section 61(a)(12). Therefore, the discharge of indebtedness doctrine does not apply, and the solvency of the individual partners or of the partnerships is irrelevant. *Estate of Delman v. Commissioner, supra.*

The amount realized by each partnership on the reconveyance of the property to COAP Planning, Inc., and Digitax, Inc., includes the amount of indebtedness to which the property is subject. *Commissioner v. Tufts, supra.* Each partnership must recognize gain to the extent that the amount of the outstanding indebtedness exceeds the partnership's basis in the reconveyed property. Sec. 1001(a); sec. 1.1001-2(a)(1), Income Tax Regs. Each partner must recognize gain to the extent of his distributive share of such income. Sec. 702(a)(8). This recognition will increase the partners' bases in their partnership interests under section 705(a)(1)(A). At the same time, each partner will receive a section 752(b) distribution as a result of the discharge of partnership liabilities which will reduce his basis under section 733(1).

Gain realized on the disposition of personal property used in a taxpayer's trade or business is characterized under section 1231. However, any depreciation taken by the taxpayer must be recaptured at the time the property is disposed of and reported as ordinary income. Sec. 1245(a)(1). Therefore, each partner has ordinary income to the extent of

his distributive share of the partnerships' gain which is attributable to the recapture of depreciation under section 1245(a)(1), and the remainder must be characterized under the rules of section 1231(a).

### 3. *Vanguard Ventures, Inc., Transactions*

The next issue for consideration is the determination of the amount and character of any loss realized by the partnerships as a result of the agreement with Vanguard Ventures, Inc. On August 29, 1977, each partnership entered into an agreement with Vanguard Ventures, Inc. Under the agreements, each partnership transferred 40,000 shares of restricted COAP common stock to Vanguard Ventures, Inc. Vanguard Ventures, Inc., in exchange, extinguished the debts owed to it by each partnership. As discussed above, with respect to the COAP Planning, Inc., and Digitax, Inc., transactions, this transaction is governed by the principles of section 1001 and is treated as a sale or exchange. Because each partnership had a basis in its stock of $50,000, which exceeded the amount of the debt owed by each partnership to Vanguard Ventures, Inc., each partner realized a loss on the transaction to the extent of his distributive share of the partnerships' loss. This loss will decrease the partners' bases in their partnership interests under section 705(a)(2)(A). At the same time, each partner will receive a section 752(b) distribution in the amount of his distributive share of the indebtedness which was discharged and a corresponding basis reduction under section 733(1). The loss realized by the partnerships on the exchange of the stock is a capital loss. Sec. 702(b).

### 4. *Amendment to Partnership Agreement*

The final issue for consideration is whether the amendment to the partnership agreement has substantial economic effect. The partnership agreement originally provided that all items of partnership income and loss would be allocated to the partners in accordance with their capital contributions; however, until each limited partner recovered his capital contribution, all items of income and loss would be allocated 95 percent to the accounts of limited partners, in proportion to their capital contributions, and 5 percent to

the general partner. The agreement was amended on December 26, 1977, to provide that net profits and losses from capital transactions would be first allocated among the partners to eliminate any deficits in their respective capital accounts and, after such deficits were eliminated, profits and losses would be allocated according to the original partnership agreement. The purpose of this agreement was (1) to allocate profits from capital transactions to any partner with a negative capital account, thereby increasing such account to zero; (2) to allocate losses from capital transactions to any partner with a positive capital account, thereby decreasing such account to zero; (3) to allocate ordinary loss for the year in issue according to the regular profit/loss ratio as stated in the original partnership agreement; and (4) to allocate all items of profit and loss from capital transactions according to the same ratio after all capital accounts had been increased or decreased to zero.

Petitioners maintain that the agreement should be respected because it was designed to leave each partner with a capital account balance of zero which, according to petitioners, reflects the economic status of the partnerships at the time of liquidation. Respondent asserts, however, that the agreement lacks substantial economic effect because its sole purpose was to limit the tax liability of the partners. Neither party cites any authority for its position.

In general, a partner's share of items of income and loss are determined by the partnership agreement and will be respected for Federal income tax purposes. Sec. 704(a). However, if the allocations provided for in the partnership agreement do not have substantial economic effect, they will be disregarded. Sec. 704(b)(2). Section 704 was amended by the Tax Reform Act of 1976 (Pub. L. 94-455). The amendment is effective for partnership years beginning after December 31, 1975. The joint committee's explanation of the amendments to section 704 indicated that, in determining whether partnership allocations had substantial economic effect, the partners' rights to distribution of capital on liquidation were to be considered. Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, 1976-3 C.B. (Vol. 2) 107 n. 6. The purpose underlying the amendments was to permit partnerships to use special

allocations for bona fide business purposes, but not for tax avoidance purposes. General Explanation of the Tax Reform Act of 1976, *supra*.

The regulations under section 704 provide that a partnership agreement which provides for special allocation of items of income and loss will be considered to have substantial economic effect if, on liquidation of the partnership, partners with positive capital accounts will receive distributions in accordance with the balance in those capital accounts and partners with negative capital accounts will be required to restore the amount of the deficit balance in those accounts to the partnership. Sec. 1.704-1(b)(2)(ii)(b)(2) and (*3*), Income Tax Regs. The effect of the amendment to the partnership agreement in the instant case is to defeat the requirement that liquidating distributions be made in accordance with capital accounts.[7]

Because the amendment to the partnership agreement does not have substantial economic effect, the amount of gain or loss to each partner for taxable year 1977 must be determined in accordance with the provisions of the original partnership agreement.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, SIMPSON, PARKER, WHITAKER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, GERBER, PARR, WILLIAMS and WELLS, *JJ.*, agree with this opinion.

---

[7]The final regulations promulgated under sec. 704(b) were filed on Dec. 24, 1985, and published on Dec. 31, 1985. T.D. 8065, 50 Fed. Reg. 53420 (1985), 1986-5 I.R.B. 5. The regulations were amended as of Sept. 9, 1986, T.D. 8099, 51 Fed. Reg. 32061 (1986), 1986-39 I.R.B. 5. The regulations are effective generally for partnership taxable years beginning after Dec. 31, 1975.

However, for partnership taxable years beginning after Dec. 31, 1975, but before May 1, 1986 (or before Jan. 1, 1987, with respect to special allocations of nonrecourse debts), a special allocation that does not satisfy their requirements nonetheless will be respected for purposes of the final regulations if such allocation has substantial economic effect as interpreted under the relevant case law and the legislative history of the Tax Reform Act of 1976, and the provisions of this paragraph in effect for partnership taxable years beginning before May 1, 1986. Sec. 1.704-1(b)(1)(ii), Income Tax Regs. Here, applying the relevant case law, the legislative history of the Tax Reform Act of 1976, and the prior regulations, the special allocation lacks economic effect under such criteria and is not to be respected.