T.C. Memo. 2017-159

UNITED STATES TAX COURT

MICHAEL E. KOHN AND CATHERINE K. KOHN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20771-96.                    Filed August 14, 2017.

Michael E. Kohn and Catherine K. Kohn, pro sese.

<u>Thomas C. Pliske</u> and <u>Catherine S. Tyson</u>, for respondent.

**[\*2]**     MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  Respondent determined the following deficiencies and accuracy-related penalties under section 6662(a),[1] with respect to petitioners' 1991 and 1992 taxable years:[2]

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 1991 | $46,727 | $9,332 |
| 1992 | 36,067 | 7,213 |

In an amendment to his answer, respondent conceded the section 6662(a) accuracy-related penalty for 1992 and instead asserted that petitioners are liable for a $26,935 section 6663 fraud penalty for that year.

Following concessions by the parties,[3] the issues for decision are:

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as in effect for the years at issue, all Rule references are to the Tax Court Rules of Practice and Procedure, and all dollar amounts are rounded to the nearest dollar.

[2]The Court stayed proceedings pending the resolution of a criminal investigation involving Mr. Kohn and upon the subsequent illness of petitioners' former counsel, since withdrawn.

[3]At trial petitioners conceded that they failed to report $5,147 of taxable interest income for 1991.

**[*3]**   (1) whether petitioners failed to report discharge of indebtedness income of $16,232 for 1991 arising from Mr. Kohn's interest in Mazur & Raben (a law firm partnership);

(2) whether petitioners failed to report $28,404[4] of capital gain for 1991 arising from a deemed distribution of money from Mazur & Raben to Mr. Kohn pursuant to section 752(b);

(3) whether petitioners are entitled to deduct Mr. Kohn's $30,287 distributive share of a partnership loss for 1991 arising from his interest in Mazur & Raben;

(4) whether petitioners are entitled to a $117,738 cost of goods sold expense as reported on their Schedule C, Profit or Loss from Business, for the Kohn Partnership (a law firm partnership) for 1991;

(5) whether petitioners are liable for an accuracy-related penalty under section 6662(a) for 1991;

---

[4]In the notice of deficiency respondent determined pursuant to secs. 752(b) and 731(a)(1) that Mr. Kohn received a $31,596 distribution in excess of his basis in his Mazur & Raben partnership interest, resulting in capital gain.  However, on brief respondent calculates the basis for 1991 as $3,192 higher than in the notice of deficiency, effectively conceding $3,192 of the unreported capital gain he determined for 1991.

**[*4]**   (6) whether petitioners are entitled to deduct Mr. Kohn's $537 distributive share of a partnership loss for 1992 arising from his interest in Mazur & Raben;

(7) whether petitioners are entitled to a $121,065 casualty loss deduction for 1992; and

(8) whether petitioners are liable for a fraud penalty under section 6663 with respect to their underpayment of tax for 1992.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  We incorporate by this reference the stipulation of facts and the accompanying exhibits.  Petitioners are husband and wife, and they resided in Missouri when they filed their timely petition.

I.   Petitioners' Education and Background

Mrs. Kohn received a B.A. from Stanford University and a J.D. from Saint Louis University School of Law.  At the time of trial Mrs. Kohn was a practicing attorney specializing in estate planning and small business counseling and was admitted to the United States Tax Court Bar.  She has rendered tax advice to clients on occasion.

Mr. Kohn received an undergraduate degree, as well as joint J.D. and M.B.A. degrees, from Saint Louis University.  Thereafter he received an LL.M.

[*5] degree from the New York University School of Law taxation program.  Mr. Kohn returned to St. Louis sometime in 1980 and began work as an associate in the tax division at Bryan, Cave, McPheeters & McRoberts (Bryan Cave), where he specialized in partnership taxation.  At the end of 1987 Mr. Kohn left Bryan Cave and joined the Mazur & Raben law firm as a general partner, commencing January 1, 1988.  Mazur & Raben at all times had 10 or fewer partners, each of whom was a natural individual.[5]

II.    Mr. Kohn's Involvement with Mazur & Raben

    A.    Mazur & Raben's Formation, Liabilities, and Dissolution

The Mazur & Raben law firm partnership was formed by four attorneys in St. Louis during the summer of 1983.  Those four attorneys entered into and guaranteed a lease of office space with Grosvenor, International (Grosvenor property) in 1983.  In 1984 the same partners signed and guaranteed a $400,000 promissory note at Centerre Bank National Association, later succeeded by The Boatmen's National Bank of St. Louis (Boatmen's), for leasehold improvements to the Grosvenor property.  In 1985 Mazur & Raben admitted several new partners,

---

[5]Given Mazur & Raben's composition and the absence of any indication that it made an election under sec. 6231(a)(1)(B)(ii), Mazur & Raben was a small partnership pursuant to sec. 6231(a)(1)(B) from its inception to its dissolution. Thus the provisions of secs. 6221 to 6234 do not apply to the partnership.

[*6] one of whom signed a lease for office space with the Forsythe Group (Forsythe property).[6] Mazur & Raben's partners thereupon took out a $500,000 loan with Lindell Trust (Lindell) for leasehold improvements to the Forsythe property.

Mr. Kohn joined Mazur & Raben as a general partner on January 1, 1988, at which point David Jones was the managing partner. Upon joining Mazur & Raben Mr. Kohn did not sign a partnership agreement. At some point after Mr. Kohn joined the partnership, Mazur & Raben entered into a line of credit loan arrangement with Lindell which Mr. Kohn guaranteed along with his partners. During his tenure at Mazur & Raben Mr. Kohn did not guarantee the lease agreements for the Grosvenor or Forsythe property, nor did he guarantee the Boatmen's or Lindell leasehold improvement loan.

Mazur & Raben dissolved between late May and mid-June of 1989, at which time four of its former partners, including Mr. Kohn, formed a new partnership under the name "Frankel, Kaiser, Kohn and Jones". However, Mr. Kohn withdrew from that partnership on June 30, 1989, whereupon it dissolved.

---

[6]New office space was deemed necessary because of problems with the air conditioning at the Grosvenor property.

**[*7]** Mr. Kohn worked briefly with another law firm and then commenced working in a law practice with Mrs. Kohn.

Upon Mazur & Raben's dissolution Mr. Jones assumed responsibility for winding up the partnership's affairs by collecting accounts receivable and settling pending lawsuits brought against the partnership by Grosvenor, International; Boatmen's; Forsythe Group; and Lindell. This process continued from mid-June of 1989 into 1992. In order to create a fund (Mazur & Raben settlement fund) out of which to make partial payments to settle with the aforementioned creditors, on March 7, 1991, Mazur & Raben's former partners signed a "Settlement Agreement and Mutual Release" (Mazur & Raben settlement agreement). Mr. Kohn agreed to pay $55,000 as part of the Mazur & Raben settlement agreement, constituting 6.2% of the Mazur & Raben settlement fund. The Mazur & Raben settlement agreement included a provision entitled "Special Tax Allocation", which provided:

> In recognition of the contribution by each of the various Partners to the settlement of the Lawsuits, to each Partners' [sic] allocation of income and loss for the year in which the Closing occurs[7] shall be credited the percentage of loss created by the settlement and satisfaction of the Lawsuits equal to the pro-rata

---

[7]"Closing" for this purpose occurred when the funds from the Mazur & Raben settlement fund were distributed to creditors in settlement of the lawsuits in 1991.

[*8]    contribution by such Partner to the fund created by the terms of this Agreement. It is specifically recognized that this is a special allocation of losses made by the Partners in recognition of the contributions to the settlement of the Lawsuits and in lieu of and in substitution for the allocation of losses pursuant to the respective interests of the Partners in the Law Partnerships.

Between March 7 and 8, 1991, Mazur & Raben's former partners entered into a settlement agreement with Lindell (Lindell settlement agreement) to resolve the lawsuit that Lindell had filed against the partners, including Mr. Kohn. At that time Mazur & Raben's outstanding indebtedness to Lindell was $572,597; Mazur & Raben agreed to pay $370,000 to settle the Lindell debt and Lindell forgave the balance. The $55,000 that Mr. Kohn agreed to pay into the Mazur & Raben settlement fund was specifically allocated to the Lindell settlement agreement, and Mr. Kohn paid that amount to Lindell by means of a $10,000 cash payment on March 18, 1991, and the execution of a $45,000 promissory note to Lindell payable over two years.[8] Petitioners paid $15,000 of the principal on the note later

---

[8]At trial Mr. Kohn testified that he paid $55,000 to Lindell in addition to the $55,000 that he contributed to the Mazur & Raben settlement fund. However, this claim is contradicted by Mazur & Raben's accountant's workpapers, which show that the Lindell debt was settled exclusively by partner funds contributed to the Mazur & Raben settlement fund, $55,000 of which was specifically earmarked as having been contributed by Mr. Kohn. Furthermore, petitioners have failed to produce any evidence substantiating an additional payment of $55,000 to Lindell apart from the one documented in the accountant's workpapers. Thus, we decline to accept Mr. Kohn's self-serving testimony to this effect.

[*9] in 1991 and paid the remaining $30,000 balance in 1992. In 1991 Mazur & Raben also settled its $151,480 outstanding indebtedness to Boatmen's; Mazur & Raben paid $92,274 to settle the debt and Boatmen's forgave the balance. In the aggregate, Lindell and Boatmen's forgave $261,803 of Mazur & Raben's indebtedness in 1991.

B.      Mazur & Raben's Forms 1065 and Mr. Kohn's Schedules K-1

Mazur & Raben filed Forms 1065, U.S. Partnership Return of Income, and Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., for 1988 through 1991 which reflect the income and tax items resulting from its operations until late spring 1989 and the winding up of its affairs thereafter.[9] Mr. Kohn received a Schedule K-1 from Mazur & Raben for each year from 1988 through 1991.[10] For each of those years Mr. Kohn reported his share of the income and tax

---

[9]Although the partnership name on the Forms 1065 and Schedules K-1 for 1989 through 1991 is reported as "Frankel, Kaiser, & Jones", the 1989 Form 1065 indicates that the firm was "formerly Mazur & Raben". Petitioners contend, respondent has not disputed, and we are convinced that the 1989, 1990, and 1991 Forms 1065 reflect the winding up of Mazur & Raben.

[10]The parties do not address and the record does not disclose whether Mr. Kohn received a 1992 Schedule K-1 from Mazur & Raben.

[*10] items as reflected on the Schedules K-1 on his personal tax return (which he filed jointly with Mrs. Kohn).[11]

For 1988 through 1991 Mr. Kohn's Mazur & Raben Schedules K-1 reported as follows:

|  | 1988 Schedule K-1 | 1989 Schedule K-1 | 1990 Schedule K-1 | 1991 Schedule K-1 |
|---|---|---|---|---|
| % Interest profits/losses | 10.962% | 16.88% | 16.88% | 6.2% |
| Capital contributions | --- | --- | --- | $55,000 |
| Liabilities | $95,460 | $125,475 | $123,045 | --- |
| Income | 46,388 | --- | 426 | [1]16,232 |
| Loss | (3,804) | (6,567) | (34) | (30,287) |
| Other deductions | --- | (3,584) | --- | --- |
| Distributions | (98,084) | (34,377) | --- | --- |

[1]Cancellation of indebtedness income.

Mazur & Raben's 1990 Form 1065 reported total liabilities of $724,077 as of the end of the year, comprising $151,480 of the Boatmen's indebtedness and $572,597 of the Lindell indebtedness. Mazur & Raben's 1991 Form 1065

---

[11]There was one exception: the $16,232 of cancellation of indebtedness income allocated to Mr. Kohn on the 1991 Schedule K-1, as further discussed infra.

**[*11]** reported total liabilities of $724,077 as of the beginning of the year and zero liabilities as of the end of the year.

III.    The Kohn Partnership

As noted, after Mazur & Raben's dissolution in 1989, Mr. Kohn--after brief stints with two other firms--commenced a law practice with Mrs. Kohn in September 1989.  Mr. and Mrs. Kohn referred to the law firm as the "Kohn Partnership" (and so designated it on their letterhead), but they reported the results of its operations for 1991, 1992, and 1993 on a Schedule C (as more full described infra pp. 15-17) rather than a Schedule E, Supplemental Income and Loss.

IV.    Petitioners' Docks at Harbor Point Marina and the Flood of 1993

On February 3, 1993, petitioners purchased four floating boat docks for $144,600 from Harbor Consultants, Inc., a company controlled by a former client of Mr. Kohn's, Jerry Jaycox.  The docks were at the Harbor Point Marina[12] in St. Charles County, Missouri, near the confluence of the Missouri and Mississippi Rivers.  Mr. Jaycox had promised petitioners upon purchasing the docks that he

---

[12]The Harbor Point Marina was a condominium arrangement, referred to in trial testimony as a "dockominium", where each boat slip and dock was individually owned and other portions of the marina were common elements jointly owned by the dock owners.

[*12] would rent them during 1993 and then by yearend either buy them back himself or secure a third party to do so.

In the spring through fall 1993 the Missouri and Mississippi Rivers flooded so severely that the President determined St. Charles County warranted assistance under the Disaster Relief and Emergency Assistance Act.

On October 4, 1993, Mr. Jaycox informed Mr. Kohn that he had secured a purchaser for petitioners' docks. Mr. Jaycox asked petitioners to sign a document entitled "Sale Contract" which listed petitioners' names, the specific dock units to be sold, and a sale price of $142,000. Petitioners signed the document and returned it to Mr. Jaycox that day. On October 5, 1993, Mr. Kohn received a fax of a sale contract with the same terms listing Mr. and Mrs. John Blackstock as the purchasers. Upon receiving the contract, Mr. Kohn on the same day faxed a copy to his contact at the Bank of Alton, which had financed petitioners' purchase of the docks, to "let him know that the loan would be paid off * * * very quickly". Transcript of record at 424, Blackstock v. Kohn, St. Louis County Mo. Cir. Ct. (1997) (No. 685655).[13]

_____

[13]Mr. Kohn made this statement in his testimony in a 1997 St. Louis County Circuit Court action in which the Blackstocks alleged that Mr. Kohn had committed fraud and professional malpractice, among other things, for his role in advising them to claim casualty loss deductions with respect to their Harbor Point

(continued...)

**[\*13]** On October 15, 1993, petitioners signed their joint Federal income tax return for 1992, claiming a $121,065 casualty loss deduction on the four Harbor Point docks on Schedule A, Itemized Deductions, as further detailed in an attached Form 4684, Casualties and Thefts. Respondent received the return on October 19, 1993. On October 22, 1993, petitioners closed on the sale of the docks to the Blackstocks for $142,000. Petitioners did not make any improvements to the docks while they owned them.

V.     Mr. Kohn's Engagement by the Blackstocks

During the late summer and early fall of 1993 Mr. Kohn was seeking clients in the St. Charles County area by holding informational seminars on claiming casualty loss deductions for flood-damaged property. Mr. Kohn met Mr. Blackstock, a fellow dock owner at Harbor Point Marina, at one such seminar on September 21, 1993. Sometime between that date and October 22, 1993, Mr. Blackstock engaged Mr. Kohn to prepare amended returns for 1989, 1990, 1991,

---

[13](...continued)
docks (Blackstock lawsuit). At the trial in the instant case respondent initially sought to introduce excerpts from Mr. Kohn's testimony in the Blackstock lawsuit. When petitioners objected on the grounds of completeness, the parties stipulated a significantly larger portion of the transcript of the trial in the Blackstock lawsuit, with respect to which neither party reserved any objection. We treat Mr. Kohn's statements therein as party admissions under Fed. R. Evid. 801(d)(2)(A).

**[*14]** and 1992 on behalf of the Blackstocks in order to claim casualty loss deductions.[14]

Sometime on October 22, 1993, after closing on the sale of petitioners' docks, Mr. Kohn met with Mr. Blackstock to discuss the preparation of the Blackstocks' amended returns, at which time Mr. Blackstock informed Mr. Kohn that he intended to claim a casualty loss deduction on the four docks the Blackstocks had just purchased from petitioners. As a result of this discussion Mr. Kohn prepared amended Federal and Missouri income tax returns on behalf of the Blackstocks for 1989 through 1992, claiming casualty loss deductions on 17 docks, including the four that the Blackstocks had purchased from petitioners and for which petitioners had claimed a casualty loss deduction on the 1992 return they signed a week before. On October 29, 1993, Mr. Kohn signed the amended returns as a return preparer and presented them to Mr. Blackstock.

---

[14]Pursuant to sec. 165(i) a taxpayer may elect to deduct a casualty loss attributable to a federally declared natural disaster for the year immediately preceding the taxable year in which the disaster occurred. If such an election is made, the casualty will be treated as having occurred in the taxable year for which the loss is claimed. Sec. 165(i)(2). Furthermore, pursuant to sec. 172 an individual may carry back an unused casualty loss as a net operating loss deduction to each of the three taxable years preceding the taxable year of the casualty.

[*15]  By June of 1995 respondent had commenced an audit of the Blackstocks' amended returns and challenged the claimed casualty loss deductions for the four docks the Blackstocks had purchased from petitioners on the grounds that the Blackstocks did not own the docks at the time of the casualty (i.e., the flood). Respondent ultimately disallowed the casualty loss deductions.

VI.   Mr. Kohn's 2002 Criminal Conviction

On October 3, 2002, Mr. Kohn pleaded guilty to and was convicted of one count of violating section 7212 for obstructing the administration of the internal revenue laws by creating fictitious debenture transactions to reduce clients' Federal income tax and crafting fee arrangements based on tax reduction.

VII.   Petitioners' Returns and Respondent's Audit

Petitioners timely filed a joint Federal income tax return for 1991.  The Schedule C attached to the return reported a proprietor and business name of "MICHAEL E KOHN" and a principal business of "ATTORNEY", and included a $64,238 "AMERICAN BANK SETTLEMENT" and a $53,500 "LINDELL TRUST SETTLEMENT" in cost of goods sold.  Petitioners' 1991 return also included a Schedule E, which reported a $30,287 nonpassive loss from the

[*16] "FRANKEL, KAISER & JONES" partnership;[15] the Schedule E did not report any cancellation of indebtedness income from the partnership. Petitioners' 1991 return did not report capital gains from any source, partnership or otherwise.

Petitioners' 1992 return reported adjusted gross income of $248,082 and, as previously noted, claimed a $121,065 casualty loss deduction on Schedule A. The attached Form 4684 specified that petitioners claimed a casualty loss deduction with respect to "4 DOCK UNITS" acquired on February 3, 1993, and attributed fair market values to the dock units before and after the casualty of $145,973 and zero, respectively.[16] The foregoing information was reported on Section A of the Form 4684, the section designated for reporting casualty losses with respect to personal use property rather than property used in a trade or business or held for income-producing purposes.

Petitioners' 1992 return also included a Schedule E which claimed a $537 nonpassive loss from the "FRANKEL, KAISER & JONES" partnership[17] and a

---

[15]This partnership was the successor to the Mazur & Raben partnership. See supra note 9.

[16]Insofar as the record discloses, petitioners did not obtain an appraisal of any damage their docks may have sustained as a result of the flooding before filing their 1992 return.

[17]See supra note 9.

**[\*17]** Schedule C listing a proprietor and business name of "MICHAEL E KOHN" and principal business of "ATTORNEY".

By 1994 respondent had commenced an audit of petitioners' 1991 and 1992 returns.

Petitioners signed a joint Federal income tax return for 1993 on April 1, 1996, which respondent received on April 8, 1996. The 1993 return included a Schedule C listing a proprietor of "MICHAEL E KOHN", principal business of "ATTORNEY", and gross receipts of $1,185,856.

VIII.  Respondent's Notice of Deficiency and Amendment to Answer

Respondent issued a notice of deficiency to petitioners on June 27, 1996, with the following adjustments to petitioners' 1991 and 1992 returns:

(a) a disallowance of the $30,287 and $537 "FRANKEL, KAISER & JONES" partnership loss deductions claimed for 1991 and 1992, respectively;

(b) a determination that petitioners failed to report Mr. Kohn's $16,232 distributive share of Mazur & Raben's discharge of indebtedness income and capital gain of $31,596 stemming from a deemed distribution in excess of Mr. Kohn's basis in his Mazur & Raben partnership interest for 1991;

(c) a disallowance of the $117,738 of cost of goods sold reported on the 1991 Schedule C;

**[\*18]** (d) a disallowance of the $121,065 casualty loss deduction claimed for 1992; and

(e) a determination that petitioners were liable for section 6662(a) accuracy-related penalties for 1991 and 1992.

Petitioners filed a timely petition for redetermination.

In an amendment to his answer respondent conceded the section 6662(a) accuracy-related penalty for 1992 and instead asserted that petitioners were liable for a section 6663 fraud penalty.

## OPINION

The Commissioner's determinations as set forth in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations wrong. See Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Rule 142(a)(1). However, as to the fraud penalty under section 6663, as more fully discussed infra, the burden of proof rests with the Commissioner to demonstrate fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

**[*19]** I.      1991

     A.      Partnership Income

Under section 702(a) a partner must recognize his distributive share of partnership income or loss; such recognition is reflected in the partner's adjusted basis in his partnership interest pursuant to section 705(a).  A partner can deduct his distributive share of partnership loss to the extent of his adjusted basis in his partnership interest at the end of the partnership year in which the loss occurred.  Sec. 704(d).  Section 752(a) provides that any increase in a partner's share in partnership liabilities shall be treated as a contribution of money by the partner to the partnership, increasing the partner's basis in his partnership interest.  See sec. 722.  Conversely, any decrease in the partner's share of the partnership liabilities is treated as a distribution of money by the partnership to the partner under section 752(b) and results in the recognition of capital gain to the extent the distribution exceeds the partner's adjusted basis in his partnership interest.  Sec. 731(a)(1).

In 1991 Mazur & Raben settled its $151,480 Boatmen's indebtedness with a payment of $92,274 and its $572,597 Lindell indebtedness with a payment of $370,000, resulting in a total of $261,803 in cancellation of indebtedness income[18]

_____

[18]Neither party disputes that the cumulative $261,803 of indebtedness from which Mazur & Raben was relieved in 1991 constitutes discharge of indebtedness
(continued...)

[*20] and the reduction of Mazur & Raben's outstanding liabilities from $724,077 at the beginning of 1991 to zero at the end. As a result of these transactions, respondent contends that petitioners must include in income Mr. Kohn's $16,232 distributive share, on the basis of his 6.2% contribution to the Mazur & Raben settlement fund and the special allocation based thereon, of Mazur & Raben's discharge of indebtedness income as well as a $123,045 deemed distribution under section 752(b) of the partnership liabilities allocated to Mr. Kohn on his 1990 Schedule K-1. Respondent argues that the deemed distribution under section 752(b) reduced Mr. Kohn's adjusted basis in his partnership interest to zero and triggered a $31,596 capital gain which petitioners must also include in income under section 731(a)(1). Respondent finally contends that because Mr. Kohn had no remaining basis in his partnership interest with which to offset his $30,287 distributive share of partnership loss for 1991, petitioners are not entitled to the deduction they claimed in this amount for 1991 and must increase their income accordingly.

Petitioners counter that under Missouri law Mr. Kohn was not personally liable for any of Mazur & Raben's debts, and as a result Mr. Kohn had no

---

[18](...continued)
income realized by the partnership.

**[*21]** partnership liability from which he could have been relieved. Consequently, petitioners argue that they are not required to recognize any of Mazur & Raben's cancellation of indebtedness income and that no deemed distribution of money to Mr. Kohn was triggered under section 752(b).

### 1.    Cancellation of Indebtedness Income

We begin our analysis by determining whether Mr. Kohn must recognize any portion of the $261,803 of discharge of indebtedness income Mazur & Raben realized in 1991. In general, gross income includes income from the discharge of indebtedness. Sec. 61(a)(12); United States v. Kirby Lumber Co., 284 U.S. 1 (1931). Income realized by a partnership under section 61(a)(12) must be recognized by the partners as ordinary income under section 702(a)(8). See Gershkowitz v. Commissioner, 88 T.C. 984, 1008-1009 (1987). The recognition of such income provides each partner with an increase in the adjusted basis in his partnership interest under section 705. Id. at 1008.

Under the Mazur & Raben settlement agreement, each partner, including Mr. Kohn, agreed that his distributive share of partnership income and loss for 1991 would be calculated according to the percentage of funds that each had contributed towards the Mazur & Raben settlement fund. Mr. Kohn contributed $55,000, or 6.2% of the $895,500 total, and thus Mazur & Raben allocated 6.2%,

**[\*22]** or $16,232, of its $261,803 in discharge of indebtedness income to Mr. Kohn on his 1991 Schedule K-1. Petitioners contend that this allocation lacks substantial economic effect under section 704(b)(2) because Mr. Kohn was not personally liable for any of the debt from which Mazur & Raben was relieved, and therefore this discharge of indebtedness income must be reallocated to Mazur & Raben's other partners.

Petitioners' attempt to frame this issue as one of substantial economic effect is misguided. The basic principle that partners must recognize as ordinary income their distributive share of partnership discharge of indebtedness income is well established, see Gershkowitz v. Commissioner, 88 T.C. at 1008, and generally does not implicate the doctrine of substantial economic effect nor does it depend on a partner's personal liability on the obligation from which the partnership is relieved. Indeed, in Gershkowitz we held that partners must recognize their distributive share of the discharge of indebtedness income realized by a partnership under section 61(a)(12) even as to nonrecourse debts for which no partner bore any personal liability. See id. at 1006-1008. Therefore, petitioners' contention that a partner may only be allocated, or need only recognize, that portion of a partnership's discharge of indebtedness income which corresponds

[*23] to those obligations for which the partner is personally liable is without merit.[19]

In sum, petitioners must recognize Mr. Kohn's 6.2% distributive share, or $16,232, of Mazur & Raben's discharge of indebtedness income for 1991, increasing Mr. Kohn's adjusted basis in his partnership interest to that extent. See sec. 705(a)(1). We sustain respondent's determination to that effect.

### 2. Mr. Kohn's Share of Mazur & Raben's Liabilities and Deemed Distribution Under Section 752(b)

We next consider Mr. Kohn's share of Mazur & Raben's liabilities at the beginning of 1991 and any deemed distribution under section 752(b) that may have occurred as a result of the elimination of the partnership's outstanding liabilities during 1991 when it settled with its creditors. This issue turns on which version of the regulations under section 752 applies to the Mazur & Raben liabilities in question. The original regulations, as promulgated in 1956 and applicable to all partnership liabilities assumed or incurred before January 30,

---

[19]Furthermore, we note that even though petitioners strenuously argue that the allocation of Mazur & Raben's discharge of indebtedness income to Mr. Kohn in accordance with the terms of the Mazur & Raben settlement agreement lacks substantial economic effect and thus must be disregarded, petitioners include this allocation in their calculation of Mr. Kohn's adjusted basis in his partnership interest for 1991. Petitioners cannot have it both ways.

[*24] 1989 (1956 regulations), provide that a partner's share of recourse[20] partnership liabilities is determined in accordance with his ratio for sharing losses under the partnership agreement. Sec. 1.752-1(e), Income Tax Regs., T.D. 6175, 1956-1 C.B. 298, 300. By contrast, the temporary regulations under section 752, which apply to all partnership liabilities assumed or incurred between January 30, 1989, and December 27, 1991, sec. 1.752-4T, Temporary Income Tax Regs., 53 Fed. Reg. 53140, 53160-53161 (Dec. 30, 1988), and the final regulations under section 752, which apply to all partnership liabilities assumed or incurred after December 28, 1991, sec. 1.752-5, Income Tax Regs., T.D. 8380, 1992-1 C.B. 218, 226, apply an economic risk of loss analysis to determine a partner's share of recourse partnership liabilities. Under those versions of the regulations, a partner's share of recourse partnership liabilities depends on the extent to which, taking into consideration all of the facts and circumstances (including personal guaranties and applicable State law), that partner would be personally obligated to make a payment to any person or creditor if all of the partnership liabilities became due and payable in a constructive liquidation scenario. See sec. 1.752-

---

[20]In the case of nonrecourse partnership liabilities--i.e., where "none of the partners have any personal liability with respect to the partnership liability"--each partner's share of such liabilities is equal to his share of partnership profits. Sec. 1.752-1(e), Income Tax Regs., T.D. 6175, 1956-1 C.B. 298, 300.

[*25] 1T(d)(3)(D)(1), Temporary Income Tax Regs., 53 Fed. Reg. 53147 (Dec. 30, 1988); sec. 1.752-2(b)(3), Income Tax Regs.

Petitioners argue that under Missouri law Mr. Kohn was not personally liable for any partnership debts incurred before his admission to Mazur & Raben, and thus Mr. Kohn had no share of partnership liabilities from which he could have received a deemed distribution under section 752(b) for 1991. In 1988, when Mr. Kohn was admitted to the partnership, Missouri law provided that "[a] person admitted as a partner into an existing partnership is liable for all the obligations of the partnership arising before his admission as though he had been a partner when such obligations were incurred, except that this liability shall be satisfied only out of partnership property"; i.e., in Missouri a newly admitted partner was not personally liable for preexisting partnership debts. Mo. Ann. Stat. sec. 358.170 (West 1988). Petitioners' argument would be colorable if either the temporary or final regulations under section 752 determined Mr. Kohn's share of Mazur & Raben's liabilities, as the bulk of Mazur & Raben's debts were incurred before Mr. Kohn's admittance to the partnership. However, because the liabilities at issue were incurred before January 30, 1989,[21] the temporary and final regulations

---

[21]As of the end of 1990 and the beginning of 1991 Mazur & Raben's Forms 1065 reported two outstanding liabilities: a $151,480 indebtedness to Boatmen's

(continued...)

**[*26]** do not govern; instead, the 1956 regulations applicable to liabilities incurred before January 30, 1989, control. Therefore, Mr. Kohn's personal liability on Mazur & Raben's indebtedness to Boatmen's or Lindell is irrelevant for purposes of this analysis.

We must therefore determine Mr. Kohn's ratio for sharing losses under the Mazur & Raben partnership agreement to establish the share, if any, of the partnership liabilities from which he was relieved in 1991. Mr. Kohn did not sign the Mazur & Raben partnership agreement upon his admission to the partnership and there is no written agreement in evidence. However, Mr. Kohn was assigned a 16.88% share of Mazur & Raben's profits and losses on his 1990 Schedule K-1. The parties have stipulated that petitioners reported all of Mr. Kohn's income and

---

[21](...continued)
and a $572,597 indebtedness to Lindell. We have found on the basis of Mr. Kohn's and Mr. Jones' testimony that the Boatmen's and Lindell leasehold improvement debts were incurred in 1984 and 1985, respectively. However, Mr. Kohn testified, and Mr. Jones confirmed, that Mazur & Raben established a line of credit with Lindell sometime after Mr. Kohn's admission to the partnership on January 1, 1988. There is no evidence in the record from which to conclusively determine which portion of Mazur & Raben's $572,597 Lindell indebtedness was attributable to the leasehold improvement loan and which was attributable to the line of credit. Nonetheless, this issue is immaterial because, even if some portion of the Lindell indebtedness were attributable to the line of credit, petitioners--who bear the burden of proof to show error in respondent's determination--have failed to offer any evidence showing that the line of credit arrangement with Lindell was entered into on or after January 30, 1989. We therefore find that the entire Lindell indebtedness is subject to the 1956 regulations.

[*27] tax items as reported on his Schedules K-1 on their personal income tax returns.[22] Petitioners having failed to show otherwise, we therefore conclude that Mr. Kohn's 16.88% share of profits and losses as reported on the 1990 Schedule K-1 reflects the underlying agreement amongst Mazur & Raben's partners regarding Mr. Kohn's share of partnership losses at that time.

As discussed supra, Mazur & Raben reported two liabilities on its Forms 1065 for the end of 1990 and beginning of 1991: a $151,480 indebtedness to Boatmen's and a $572,597 indebtedness to Lindell, for a total of $724,077. Mr. Kohn had a 16.88% share of Mazur & Raben's losses as of the end of 1990; therefore, as of the end of 1990 and beginning of 1991 Mr. Kohn's share of Mazur & Raben's liabilities was $122,224.[23] By the end of 1991 all of Mazur & Raben's outstanding liabilities had been eliminated, relieving Mr. Kohn of his $122,224 share of the partnership's liabilities. Therefore, under section 752(b) Mr. Kohn received a deemed distribution of $122,224 from Mazur & Raben in 1991.

The income tax effects of this deemed distribution turn on Mr. Kohn's adjusted basis in his Mazur & Raben partnership interest. As discussed supra, a

---

[22]With the exception of Mr. Kohn's share of Mazur & Raben's cancellation of indebtedness income for 1991, as discussed supra.

[23]Mr. Kohn's Schedule K-1 for 1990 reports his share of partnership liabilities as $123,045. The record does not explain this discrepancy.

[*28] deemed distribution under section 752(b) reduces a partner's adjusted basis in his partnership interest and results in the recognition of capital gain to the extent that the distribution exceeds the partner's adjusted basis. See sec. 731(a)(1). Taking into consideration the income and tax items reported on Mr. Kohn's 1988-1991 Schedules K-1, we calculate Mr. Kohn's adjusted basis in his Mazur & Raben partnership interest for 1991 as follows:[24]

---

[24]With the exception of the $30,287 loss allocated to Mr. Kohn on his 1991 Schedule K-1, which we address infra.

[*29]

| Year | Item | Adjustment | Resulting basis |
|------|------|-----------|-----------------|
| 1988 | | | |
| | Share of liabilities | $95,460 | $95,460 |
| | Income | 46,388 | 141,848 |
| | Loss | (3,804) | 138,044 |
| | Distributions | (98,084) | 39,960 |
| 1989 | | | |
| | Additional liabilities | 30,015 | 69,975 |
| | Loss | (6,567) | 63,408 |
| | Unallowed deduction | (3,584) | 59,824 |
| | Distributions | (34,377) | 25,447 |
| 1990 | | | |
| | Income | 426 | 25,873 |
| | Reduction in liabilities | (2,430) | 23,443 |
| | Loss | (34) | 23,409 |
| 1991 | | | |
| | Capital contribution | 55,000 | 78,409 |
| | COD income | 16,232 | 94,641 |
| | Reduction in liabilities | (122,224) | (27,583) |

Thus, Mr. Kohn had an adjusted basis of $94,641 in his partnership interest immediately before the $122,224 deemed distribution under section 752(b) as a result of the elimination of his share of partnership liabilities in that amount. Since the deemed distribution exceeded his adjusted basis in his partnership

**[\*30]** interest by $27,583, he was required to recognize capital gain in that amount for 1991 under section 705(a). We accordingly sustain respondent's determination to that effect.

### 3. Mr. Kohn's Partnership Interest Basis and Loss Allocations

A partner can deduct his distributive share of partnership loss only to the extent of his adjusted basis in his partnership interest at the end of the partnership year in which the loss occurred. Sec. 704(d). Having determined that Mr. Kohn had no remaining basis in his Mazur & Raben partnership interest as of the end of 1991, we accordingly conclude that petitioners were not entitled to deduct Mr. Kohn's $30,287 distributive share of partnership losses for that year and we sustain respondent's determination to that effect.

### B. Cost of Goods Sold

Petitioners claimed $64,238, described as "AMERICAN BANK SETTLEMENT", and $53,500, described as "LINDELL TRUST SETTLEMENT", as cost of goods sold on their 1991 Schedule C. Respondent disallowed both amounts.

This Court has consistently held that cost of goods sold is not a deduction (within the meaning of section 162(a)) but is subtracted from gross receipts in the determination of a taxpayer's gross income. See Beatty v. Commissioner, 106

**[*31]** T.C. 268 (1996); <u>Max Sobel Wholesale Liquors v. Commissioner</u>, 69 T.C. 477 (1977), <u>aff'd</u>, 630 F.2d 670 (9th Cir. 1980). Section 1.61-3(a), Income Tax Regs., provides that in a manufacturing, merchandising, or mining business, "gross income" means the total sales, less the total cost of goods sold. Cost of goods sold does not involve the selling of services. <u>Id.</u>; <u>see also</u> <u>Hahn v. Commissioner</u>, 30 T.C. 195, 197-198 (1958), <u>aff'd per curiam</u>, 271 F.2d 739 (5th Cir. 1959).

Petitioners' Schedule C business for 1991--which Mr. Kohn testified was the Kohn Partnership--provided legal services and was not engaged in manufacturing, merchandising, or mining as far as the record discloses. However, respondent did not dispute petitioners' characterization of the figures for the "AMERICAN BANK SETTLEMENT" and "LINDELL TRUST SETTLEMENT" as cost of goods sold in the notice of deficiency, but rather disallowed them for lack of substantiation and business purpose. On brief petitioners and respondent treat the amounts as disputed claims for deductible business expenses under section 162, and we consider them as such.

Section 162(a) permits the deduction of ordinary and necessary expenses paid or incurred in carrying on a trade or business. However, taxpayers must

[*32] maintain books and records sufficient to establish the amounts of any deductions. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

Petitioners claim, and Mr. Kohn testified, that the $64,238 "AMERICAN BANK SETTLEMENT" was an ordinary and necessary business expense because the funds from the American Bank loan were used in part to start the Kohn Partnership and in part to reimburse Mr. Kohn's former clients who had been wrongfully charged for work in process upon Mazur & Raben's dissolution.[25] Respondent argues, inter alia, that petitioners have not substantiated the business purpose of the American Bank loan. The record contains no documentary evidence substantiating the existence of any American Bank loan, its amount, or its ultimate use, and we are not obligated to accept Mr. Kohn's uncorroborated and self-serving testimony to that effect.[26] See Tokarski v. Commissioner, 87 T.C. 74,

---

[25]Petitioners alternatively argue that the contested business expenses may be deducted under sec. 166 as bad debts. Because petitioners are claiming to have been the borrowers with respect to the American Bank loan, and the record establishes that they borrowed money from Lindell to finance the bulk of Mr. Kohn's contribution of $55,000 to the Mazur & Raben settlement fund, we are unable to grasp the nature of their claim to bad debt deductions arising from these transactions.

[26]At trial, petitioners offered into evidence a letter written by an Internal Revenue Service (IRS) Appeals Officer to substantiate the existence and amount of the American Bank loan. Respondent objected, and we allowed the parties to address the admissibility of the document on brief. Petitioners have not done so,

(continued...)

**[*33]** 77 (1986). We conclude that petitioners are not entitled to deduct the $64,238 attributed to the American Bank settlement as an ordinary and necessary business expense under section 162(a) or to treat it as a cost of goods sold in computing gross income on their 1991 Schedule C.

As for petitioners' claimed deduction (or cost of goods sold adjustment) for $53,500 described on their 1991 Schedule C as for a "LINDELL TRUST SETTLEMENT", we conclude on the basis of our examination of the entire record that this figure represents the bulk of the $55,000[27] that Mr. Kohn paid in 1991 into the Mazur & Raben settlement fund, which was specifically designated to be paid to Lindell. Petitioners concede on brief that the amount of Mr. Kohn's contribution to the Mazur & Raben settlement fund that was paid to Lindell should not have been deducted by them but instead added to Mr. Kohn's adjusted basis in his Mazur & Raben partnership interest. We agree. The $55,000 Mr. Kohn paid into the Mazur & Raben settlement fund was a contribution to capital of the Mazur & Raben partnership. We have treated it as an addition to Mr. Kohn's adjusted basis in his partnership interest for 1991, see supra p. 29, as part of our

---

[26](...continued)
and we accordingly sustain respondent's objection and do not admit the document.

[27]The discrepancy between the two figures is not explained in the record.

**[*34]** redetermination of his deemed distribution under section 752(b) for 1991. Consequently, petitioners are not entitled to the $53,500 claimed as cost of goods sold on their 1991 Schedule C.

C.      Section 6662 Accuracy-Related Penalty

Respondent determined an accuracy-related penalty under section 6662(a) and (b)(1) on the basis of negligence or disregard of rules or regulations for 1991. Section 6662(a) and (b)(1) imposes a 20% penalty on any underpayment of tax attributable to negligence or disregard of rules and regulations. "'[N]egligence' includes any failure to make a reasonable attempt to comply" with the internal revenue laws. Sec. 6662(c). It connotes "a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g 43 T.C. 168 (1964) and T.C. Memo. 1964-299), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991). This includes "any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Sec. 1.6662-3(b)(1), Income Tax Regs. Disregard of rules and regulations includes any careless, reckless, or intentional disregard of the Internal Revenue Code, the regulations, or certain IRS administrative guidance. Id. subpara. (2).

**[\*35]** No penalty is imposed with respect to any portion of an underpayment if the taxpayer acted with reasonable cause and in good faith with regard to that portion. Sec. 6664(c)(1). That determination is made case by case, depending on the facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Those circumstances include the experience, knowledge, and education of the taxpayer. Id.

At trial Mr. Kohn conceded that petitioners received $5,147 of unreported interest income as substantiated by Forms 1099-INT, Interest Income. Negligence is strongly indicated where a taxpayer fails to report income reflected on information returns, sec. 1.6662-3(b)(1)(i), Income Tax Regs., and petitioners have not offered any evidence of reasonable cause for their failure to report this income. Accordingly, the portion of the underpayment attributable to the unreported interest income for 1991 is due to negligence.

Petitioners have additionally conceded that the "LINDELL TRUST SETTLEMENT" adjustment to cost of goods sold should not have been claimed as such, and have failed to substantiate the existence, amount, or use of any loan giving rise to the "AMERICAN BANK SETTLEMENT" claimed for 1991. Petitioners have offered no evidence to demonstrate that they acted with reasonable cause and in good faith regarding these amounts, particularly in view of Mr. Kohn's experience as a tax attorney. Consequently, the underpayment

[*36] attributable to petitioners' inclusion of the $64,238 "AMERICAN BANK SETTLEMENT" and the $53,500 "LINDELL TRUST SETTLEMENT" as cost of goods sold for 1991 is due to negligence.

As to that portion of the underpayment attributable to petitioners' failure to report Mr. Kohn's distributive share of Mazur & Raben's discharge of indebtedness income and to recognize capital gain upon Mr. Kohn's relief from his share of Mazur & Raben's liabilities, petitioners argue that the negligence penalty is inappropriate because their position is correct; i.e., Mr. Kohn was not personally liable for any portion of Mazur & Raben's debts and thus neither received a deemed distribution under section 752(b) nor had to recognize discharge of indebtedness income upon their compromise and settlement. Petitioners do not address that portion of the underpayment attributable to the disallowed deduction for Mr. Kohn's distributive share of Mazur & Raben's 1991 loss.

As discussed supra, petitioners' position is incorrect. Further, it is clear from our review of the record that petitioners "cherry-picked" Mr. Kohn's Mazur & Raben Schedule K-1, choosing to report on their 1991 return the items that provided a tax benefit and ignoring those that had a contrary effect. For example, on their 1991 return petitioners disregarded Mr. Kohn's distributive share of

[*37] Mazur & Raben's cancellation of indebtedness income and the deemed distribution of Mr. Kohn's share of the partnership's liabilities under section 752(b), yet at the same time reported Mr. Kohn's distributive share of Mazur & Raben's losses and included Mr. Kohn's share of Mazur & Raben's liabilities in their calculation of the adjusted basis of his partnership interest. Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code. Sec. 6662(c). Given Mr. Kohn's position as an experienced tax attorney who had specialized in partnership taxation, petitioners' selective reporting of the items on Mr. Kohn's Schedule K-1 does not reflect a "reasonable attempt to comply" with the Internal Revenue Code. See sec. 6662(c). We therefore find that the portions of the underpayment attributable to petitioners' erroneous deduction of Mr. Kohn's distributive share of Mazur & Raben's partnership loss, as well as petitioners' failure to report Mr. Kohn's distributive share of Mazur & Raben's cancellation of indebtedness income and capital gain under sections 752(b) and 731(a)(1), are due to negligence.

II.  1992

   A.  Partnership Income

   Respondent disallowed the deduction for the $537 distributive share of Mazur & Raben's loss that petitioners claimed for 1992 on the grounds that Mr.

[*38] Kohn lacked a sufficient basis in his partnership interest. As discussed supra, as of the end of 1991 Mr. Kohn had no remaining basis in his Mazur & Raben partnership interest, and there is no evidence to suggest that Mazur & Raben earned income or that Mr. Kohn made any further capital contributions to the partnership in 1992 that would have increased his basis. A partner may claim his distributive share of a partnership loss only to the extent it does not exceed his adjusted basis in his partnership interest. Sec. 704(d). Petitioners are therefore not entitled to deduct Mr. Kohn's $537 distributive share of partnership loss for 1992.

    B.    Casualty Loss

Section 165(c)(3) and (h)(1) permits individuals to deduct losses suffered on the damage or destruction of personal use property[28] by reason of fire, storm, shipwreck, or other casualty to the extent that the loss from each casualty exceeds $100 and is not compensated for by insurance or otherwise. Section 165(h)(2)

---

[28]While Mr. Kohn made vague references to rents received with respect to the docks in his testimony at trial in the instant case and in the Blackstock lawsuit, petitioners offered no substantiation of any payments of rent. Moreover, petitioners claimed the casualty loss purportedly arising from the docks on Section A of the Form 4684 for 1992, where losses on personal use property are to be reported, and they did not report any rental income on their Schedule E for 1993. We treat their return positions as an admission that the docks were personal use property.

**[*39]** limits the deduction to the amount by which the aggregate casualty losses for the taxable year exceed 10% of the individual's adjusted gross income. Casualty loss deductions are generally allowed only for the year in which the casualty takes place. Sec. 165(a). However, section 165(i) provides that any loss attributable to a disaster occurring in an area subsequently determined by the President to warrant assistance under the Disaster Relief and Emergency Assistance Act may, at the election of the taxpayer, be taken into account for the taxable year immediately preceding the taxable year in which the disaster occurred. If such an election is made, the casualty resulting in the loss is treated as having occurred during the taxable year for which the loss is claimed. Sec. 165(i)(2).

The President determined that in 1993 St. Charles County, where petitioners' docks were located, suffered a natural disaster warranting assistance under the Disaster Relief and Emergency Assistance Act. See Rev. Rul. 94-14, 1994-1 C.B. 72, 76. Taking advantage of section 165(i), petitioners claimed a $121,065 casualty loss for 1992 for the alleged damage to their docks during the flood of 1993. Respondent asserts that petitioners did not in fact suffer a loss on the docks because they were sold in October 1993 for an amount which approximated what petitioners paid for them in February 1993. Petitioners

**[\*40]** maintain that the casualty loss was appropriate at the time they filed their 1992 return.

The amount of a casualty loss is generally computed as the excess of the fair market value of the property immediately before the casualty over the fair market value of the property immediately after the casualty, limited by the adjusted basis of the property. Helvering v. Owens, 305 U.S. 468 (1939); sec. 1.165-7(b)(1), Income Tax Regs. The respective fair market values "shall generally be ascertained by competent appraisal." Sec. 1.165-7(a)(2)(i), Income Tax Regs. In the absence of an appraisal in this case, however, respondent asserts that we may ascertain the extent of petitioners' loss, or lack thereof, by comparing the docks' February 1993 purchase price with their October 1993 sale price.

This Court has used sale price to ascertain the validity of a casualty loss claim where the property at issue was sold in close proximity to the casualty. See Taylor v. Commissioner, T.C. Memo. 1979-261; Woods v. Commissioner, T.C. Memo. 1960-72. In this instance the President determined that St. Charles County was affected by a disastrous flood in 1993 from April 15 through May 29, and from June 10 through October 25. Rev. Rul. 94-14, 1994-1 C.B. at 76. Petitioners purchased the docks for $144,600 approximately two months before the flood and sold the docks before the flood's end for $142,000, without having made any

[*41] improvements.[29] Given the proximity to the flood of the docks' purchase and sale, we conclude that these prices indicate the fair market value of the docks immediately before and after the casualty, respectively. Assuming arguendo that this $2,600 decline in value was attributable to the flood, it would not exceed the 10% adjusted gross income floor provided in section 165(h)(2). The floor in petitioners' case would have been at least $24,808, as petitioners reported adjusted gross income of $248,082 on their 1992 return.[30] Consequently, petitioners are not entitled to any portion of the claimed casualty loss deduction for 1992.

C.    Fraud Penalty

Respondent determined that petitioners are liable for a section 6663 fraud penalty for 1992 with respect to the underpayment of tax attributable to their claimed casualty loss. In relevant part, section 6663 provides:

SEC. 6663.  IMPOSITION OF FRAUD PENALTY.

(a) Imposition of Penalty.--If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be

---

[29]Petitioners have not claimed, nor is there any evidence of, improvements made during the period they owned the docks.

[30]As discussed supra pp. 37-38, petitioners erroneously deducted Mr. Kohn's $537 distributive share of Mazur & Raben's partnership loss in 1992. Eliminating that deduction would marginally increase the 10% adjusted gross income floor of sec. 165(h)(2).

**[\*42]** added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.

(b) Determination of Portion Attributable to Fraud.--If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud.

(c) Special Rule for Joint Returns.--In the case of a joint return, this section shall not apply with respect to a spouse unless some part of the underpayment is due to the fraud of such spouse.

The Commissioner bears the burden of proof with respect to the fraud penalty and must prove by clear and convincing evidence that (1) an underpayment of tax exists and (2) some portion of the underpayment is due to fraud. Sec. 7454(a); Rule 142(b); DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992). "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." Ohio v. Akron Ctr. for Reprod. Health, 497 U.S. 502, 516 (1990) (quoting Cross v. Ledford, 120 N.E.2d 118, 123 (Ohio 1954)).

[*43] Consistent with our previous findings, we are satisfied that respondent has clearly and convincingly established the existence of an underpayment of tax for 1992 relating to petitioners' claimed casualty loss deduction. Respondent has clearly and convincingly demonstrated that the docks' $2,600 diminution in value, even if attributable to flooding, was far too insubstantial to qualify as a deductible casualty loss. Respondent must therefore prove clearly and convincingly that petitioners had the requisite fraudulent intent in claiming that loss. Respondent satisfies this burden by showing that petitioners "intended to evade taxes known to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of taxes." DiLeo v. Commissioner, 96 T.C. at 874; see also Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Fraud "does not include negligence, carelessness, misunderstanding or unintentional understatement of income." United States v. Pechenik, 236 F.2d 844, 846 (3d Cir. 1956).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. See DiLeo v. Commissioner, 96 T.C. at 874; Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), aff'd without published opinion, 578 F.2d 1383 (8th Cir. 1978). Because fraud can rarely be established by direct proof of the taxpayer's intention, fraud may be, and typically is, proved by circumstantial evidence; indeed, the courts have articulated a nonexclusive list

**[\*44]** of several "badges of fraud" that constitute this circumstantial evidence, including the taxpayer's experience and knowledge, especially with respect to tax laws; his offering implausible or inconsistent explanations (including false testimony); and his engagement in illegal activities.  See, e.g., Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Solomon v. Commissioner, 732 F.2d 1459, 1461-1462 (6th Cir. 1984), aff'g per curiam T.C. Memo. 1982-603; DiLeo v. Commissioner, 96 T.C. at 875; Parks v. Commissioner, 94 T.C. 654, 664-665 (1990); Recklitis v. Commissioner, 91 T.C. 874, 910 (1988); Rowlee v. Commissioner, 80 T.C. at 1123; Gajewski v. Commissioner, 67 T.C. at 199.  More generally, fraudulent intent may be inferred from "any conduct, the likely effect of which would be to mislead or to conceal." Spies v. United States, 317 U.S. 492, 499 (1943).

This case presents one of the rare instances where the fraud is established in the first instance by direct, not circumstantial, proof.  Respondent contends that petitioners claimed a $121,065 casualty loss deduction on their 1992 return with fraudulent intent because they knew that the docks they were claiming as worthless would be sold in a matter of weeks for approximately what they had paid for them.

**[*45]**  We agree.  Petitioners both signed the contract to sell their four docks for $142,000 on October 4, 1993.  While the contract was not signed by the Blackstocks at that time and the entry for the purchaser was blank, Mr. Kohn conceded in his testimony that he received a faxed version of the contract the next day (October 5) with the Blackstocks identified as the purchasers.  Petitioners signed their 1992 return 10 days later on October 15, 1993, on which they took the position that the four docks had become worthless during 1993 (which gave rise to a loss that could be claimed for 1992).  The sale of the docks closed on October 22, 1993, for a sale price of $142,000.

Petitioners endeavor to negate any fraudulent intent in the foregoing chronology by contending that they signed the sale contract at the behest of Mr. Jaycox because he indicated he had found a purchaser, but that they did not believe at the time that the docks could be sold because they were worthless.  Thus, their argument goes, they believed the docks were worthless when they signed the 1992 return on October 15, 1993, and only learned otherwise when the sale closed just over one week later on October 22, 1993.[31]  Mr. Kohn testified to

---

[31]Alternatively, petitioners argue that fraudulent intent is negated by the fact that they included the proceeds from the sale of the docks as income on their 1993 return in accordance with the tax benefit rule.  We are unpersuaded for several reasons.  First, it is well established that fraud is complete at the time a fraudulent

(continued...)

[*46] that effect, but his testimony is flatly contradicted by the sworn testimony he earlier gave in the Blackstock lawsuit. In the Blackstock lawsuit, Mr. Kohn testified that on October 5, 1993, when he received the copy of the sale contract identifying the Blackstocks as purchasers, he immediately faxed it to his contact at the Bank of Alton, telling him that the loan the Kohns had taken out to purchase the docks would be quickly paid off. We conclude that Mr. Kohn fully expected

---

[31](...continued)
return is filed despite a taxpayer's later conduct. Badaracco v. Commissioner, 464 U.S. 386, 394 (1984). Second, Mr. Kohn was an experienced tax attorney and the tax benefit rule would have dictated inclusion in the 1993 return of the $121,065 loss claimed on the 1992 return, not the sale proceeds--rendering petitioners' contention implausible. See sec. 111(a). Third, petitioners have not demonstrated that any such proceeds were included on their 1993 return. They contend that the proceeds were reported as part of the $1,185,856 in gross receipts reported on the Schedule C for the Kohn Partnership. Nevertheless, petitioners have not disaggregated the gross receipts figure on their 1993 Schedule C in any meaningful way that would demonstrate that the sale proceeds from the docks were included in reported gross receipts. Moreover, we find it implausible, given Mr. Kohn's tax expertise, that he could believe that the appropriate place to include the sales proceeds from the docks, under the tax benefit rule or otherwise, was as gross receipts of the Kohn Partnership. As the documents covering the sale of the docks demonstrate, the docks were owned by petitioners individually. They were not partnership assets, and there is no evidence that they were used in the trade or business of the Kohn Partnership. Finally, petitioners did not file their 1993 return until April 1996, after the commencement of the audit of the Blackstocks' 1992 return in 1995. By April 1996, then, Mr. Kohn almost certainly knew (as the Blackstocks' return preparer) that their casualty loss claim with respect to the docks was under respondent's scrutiny. In sum, petitioners' contentions concerning the reporting of income from the docks' sale on their 1993 return do not negate fraudulent intent.

[*47] the sale of the docks for $142,000 would soon be consummated when he signed the 1992 return claiming that the docks had become worthless in 1993. The casualty loss claimed on this premise substantially reduced the taxes otherwise due--which as a tax attorney he surely knew.[32] We therefore find that Mr. Kohn intended to evade taxes known to be owing by signing a return that claimed a loss he knew was fictitious, thereby preventing the collection of taxes.

As for Mrs. Kohn,[33] we have only the evidence that she was an experienced attorney who had occasionally counseled clients on tax matters; that she signed the sale contract on October 4, 1993, to sell the docks for $142,000; that she signed the 1992 return on October 15, 1993, claiming the docks were worthless; and that

---

[32]Certain items of circumstantial evidence buttress the finding of fraudulent intent. First, Mr. Kohn was an experienced tax attorney with an advanced degree in taxation law. Second, Mr. Kohn pleaded guilty to and was convicted of one count of violating sec. 7212 for obstructing the administration of the internal revenue laws. We accordingly hold that Mr. Kohn is liable for the fraud penalty with respect to the portion of the underpayment attributable to the disallowed casualty loss for 1992.

[33]Sec. 6663(c) provides that in the case of a joint return, no fraud penalty is imposed with respect to a spouse unless some part of the underpayment is due to the fraud of such spouse. Respondent has contended throughout that both petitioners are liable for the fraud penalty and petitioners have not addressed sec. 6663(c). In any event, as discussed supra, we find that respondent has shown by clear and convincing evidence that Mrs. Kohn also had fraudulent intent in claiming the casualty loss deduction, and thus a portion of the underpayment is due to her fraud.

[*48] the sale of the docks for $142,000 was consummated on October 22, 1993. Although Mrs. Kohn testified, she gave no testimony to rebut the obvious inference from the juxtaposition of her October 4, 1993, signing of a contract to sell the docks for $142,000 and her signing of the 1992 return on October 15, 1993, that she was fully aware that the docks were not worthless when she signed the 1992 return. Thus, we are satisfied that Mrs. Kohn is liable for the fraud penalty with respect to that portion of the underpayment attributable to the disallowed casualty loss deduction for 1992. See sec. 6663(c).

Section 6663(b) provides that if any portion of an underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud unless the taxpayer establishes by a preponderance of the evidence that some portion of the underpayment is not attributable to fraud. We have sustained respondent's determination that petitioners are not entitled to deduct Mr. Kohn's $537 distributive share of Mazur & Raben's partnership loss for 1992. As petitioners have not addressed section 6663(b), the underpayment arising from the disallowed deduction of Mr. Kohn's distributive share of Mazur & Raben partnership loss is also attributable to fraud.

**[\*49]**  To reflect the foregoing,

Decision will be entered under

Rule 155.
